# In the United States Court of Federal Claims

No. 18-871
Filed: January 21, 2021
FOR PUBLICATION

|  |  |
|---|---|
| **TIMOTHY C. DEVINE,** *Plaintiff,* v. **UNITED STATES,** *Defendant.* | Keywords: RCFC 12(b)(1), 26 U.S.C. § 6511(d), 26 U.S.C. § 166, 26 C.F.R. § 1.166-1(c), Tax Refund Claim, Business Bad Debt Deduction, Net Operating Loss, American Recovery and Reinvestment Act of 2009 |

*Michael James Maloney*, Felicello Law P.C., New York, NY, for the plaintiff.

*Miranda Bureau*, Tax Division, U.S. Department of Justice, Washington, D.C., with whom was *David Pincus*, Tax Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

*HERTLING*, **Judge**

The plaintiff, Timothy C. Devine, is a former music industry senior executive who in 2003 began investing in real estate. In 2004, Mr. Devine partnered with a general contractor and developer named Shauna Giliberti to purchase, rehabilitate, and rent or sell a Los Angeles mansion located at 2450 Solar Drive ("Solar Drive" project). Mr. Devine funded the Solar Drive project through monetary advances to Ms. Giliberti. Soon thereafter, Ms. Giliberti became unable to repay Mr. Devine for his contributions to the Solar Drive project.

This case concerns Mr. Devine's efforts to seek a business-bad-debt deduction for his asserted 2008 net operating loss ("NOL") attributable to the advances he made to the Solar Drive project and to elect to carry back his loss to tax years 2003-2007. Ordinarily, a taxpayer may only carry back a NOL for a period of up to two years. A NOL may be offset against taxable income for the two years preceding the occurrence of the NOL. Mr. Devine seeks to extend the statute of limitations to claim a refund through 26 U.S.C. § 6511(d) and extend the carryback period through a provision of the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. 111-5, 123 Stat. 115, enacted in response to the 2008 financial crisis.[1]

---

[1] References to Title 26 of the United States Code are cited hereafter as "I.R.C."

The defendant, the United States, acting through the Internal Revenue Service ("IRS"), opposes the plaintiff's attempt to carry back his NOL to 2003-2007. The IRS had previously permitted a carryback to 2006 and 2007 and issued the plaintiff two refund checks. That two-year carryback did not satisfy the plaintiff, who sued for refunds he alleges are due to him for tax years 2003, 2004, and 2005. After the plaintiff filed this suit, the defendant altered its position and now argues that Mr. Devine was not entitled to a business-bad-debt deduction at all. The government has counterclaimed for the return of the two refund checks that it argues were issued in error.

Upon the completion of discovery, the defendant has moved both to dismiss and for summary judgment on the plaintiff's claim and to transfer its counterclaims to the Central District of California.

## I.   BACKGROUND

The plaintiff was a successful music industry senior executive. (ECF 39, Pl. Resp. Ex. A, A033.) He worked for Sony Music from 1995 until 2007. (*Id.*) From 2003 to 2005, he earned a salary of approximately $1 million annually. (ECF 36, Def. Mot. Ex. 19, A366.)

### A.   Real-Estate Development

In 2003, Mr. Devine decided to pursue a career in real-estate development after attending seminars on the real-estate industry. (ECF 39, Pl. Resp. Ex. A, A058.) He planned to identify and acquire properties for rehabilitation, intending to restore them and offer them for rent or sale. Based on the advice of his accountant, Mr. Devine set up separate holding companies for each of the properties he acquired. (*Id.* at A054.)

Later that year, Mr. Devine acquired two properties in connection with his new real-estate business: "Emerald Bay" in the Bahamas, and the "Breakers" in Playa Del Rey, California. (ECF 39, Devine Decl. ¶¶ 5-6, A02.) He directly managed the renovation and rental of those properties. (*Id.*)

In March 2004, Mr. Devine met Ms. Giliberti, a licensed general contractor and the principal of a real-estate-development company with knowledge of rehabilitation and redevelopment of residential properties. (ECF 39, Pl. Resp. Ex. A, A034-35.) Ms. Giliberti introduced Mr. Devine to the Solar Drive property, an 11,000-square-foot mansion located at 2450 Solar Drive in Los Angeles, situated on 22 acres in the Hollywood Hills with broad views over downtown Los Angeles. (*Id.*) The mansion required extensive restoration work.

Mr. Devine agreed to partner with Ms. Giliberti on the purchase and rehabilitation of the Solar Drive property. On May 6, 2004, Mr. Devine and Ms. Giliberti closed on their purchase of Solar Drive. The purchase price was $3.7 million. (ECF 36, Def. Mot. Ex 1.) Mr. Devine purchased his 50 percent share of the property as part of a like-kind exchange under I.R.C. § 1031. (*Id.*, Ex. 9, Ex. 27.) Mr. Devine advanced the funds necessary to purchase the property. To acquire the property, he provided $4,050,464.30, $1,645,464.30 from his own funds and

$2,405,000.00 from the proceeds of a loan he obtained in his own name.[2]  (ECF 39, Pl. Resp. Ex. A, A079.)

Mr. Devine created Solar Drive, LLC, of which he was the sole member through another LLC, in conjunction with the Solar Drive project.  (*Id.*, Pl. Resp. Ex. A, A045-46.)  Shortly after closing, Mr. Devine transferred his 50 percent tenant-in-common interest in the property to Solar Drive, LLC.  (*Id.* at A062.)

On or around the purchase date of the Solar Drive property, Mr. Devine and Ms. Giliberti executed a Side Letter.  It recited that each held an undivided 50 percent co-ownership interest in Solar Drive as tenants in common.  (*Id.*, Pl. Resp. Ex. C.)  It provided that the parties would attempt to refinance the property as soon as possible after the closing, and that any proceeds from the refinancing would first be applied to reimburse the co-owners for monies advanced to improve and repair the property.  (*Id.* ¶ 4.)  The parties agreed to accept any bona fide offer for at least $15 million to purchase the property.  (*Id.* ¶ 5.)

The Side Letter also specifically provided that:

> [i]n the event the Co-Owners execute promissory note(s) between the two of them and said promissory note(s) relate to the Property . . . . [a]ll Promissory Notes shall be paid in full upon the due date stated in the Promissory Note or the sale or refinance of the Property, whichever shall occur first.  In the event of a sale or refinance of the Property, any unpaid Promissory Notes shall be paid directly from the escrow that receives the proceeds of the refinance or sale.

(*Id.* ¶ 6.)

Mr. Devine and Ms. Giliberti also prepared a Co-Tenancy Agreement that was incorporated into the Side Letter and provided:

> [a]ll benefits and obligations of the Property, including without limitation, income, revenue, operating expenses, debt, proceeds from sale or refinance or condemnation awards shall be shared by the Co-Owners in proportion to their respective ownership interest . . . .  No Co-Owner may advance funds to another Co-Owner to meet expenses associated with that Co-Owner's Ownership Interest, unless the advance is recourse to the Co-Owner and is for a period not to exceed 31 days.  Such advances shall be evidenced by a Promissory Note containing a market rate of interest.

---

[2] The total price of the acquisition exceeded $3.7 million due to various fees and taxes that had to be paid at closing.

(*Id.*, Pl. Resp. Ex. B ¶ 5.)

Although the Co-Tenancy Agreement itself was never signed, the Side Letter, which was signed, expressly incorporated the Co-Tenancy Agreement and provided that "[t]his agreement and the Co-Tenancy Agreement between the parties dated May 6, 2004" are integrated agreements that set forth the entire agreement between the parties.  (*Id.*, Pl. Resp. Ex. C ¶ 9.8.)

Mr. Devine agreed to pay Ms. Giliberti $1,600 per week for general contractor services for as long as Solar Drive needed improvements.  (*Id.* ¶ 7.)  These sums paid for renovations to the master bedroom, kitchen, and other areas of the house.  (*Id.*, Pl. Resp. Ex. C, A070.)  The plaintiff's apparent intent was for Ms. Giliberti to reimburse him for 50 percent of the sums he advanced for improvements to Solar Drive "[b]ecause it was all going to benefit each of our ownership stakes in the property."  (*Id.*, Pl. Resp. Ex. A, A093.)

### B.      Purchase and Settlement Agreement and Subsequent Judgment

Around 2005, Mr. Devine began demanding that Ms. Giliberti repay the money she owed him.  (ECF 39, Devine Decl. ¶ 16.)  By 2006, Ms. Giliberti had pledged her 50 percent tenant-in-common interest in the Solar Drive property to several different lenders.  (ECF 39, Pl. Resp. Ex. A, A117.)  In April 2006, Ms. Giliberti filed for bankruptcy under Chapter 11; her bankruptcy was later converted to Chapter 7.  (*Id.*, Pl. Resp. Ex. N, Ex. X.)  In the bankruptcy proceeding, Solar Drive, LLC filed a Proof of Claim evidencing the sums that Ms. Giliberti owed to Mr. Devine; the liquidated portion of these sums totaled $1,467,339.32.  (*Id.*, Pl. Resp. Ex. N.)

In August 2006, Solar Drive, LLC commenced an adversary proceeding against Ms. Giliberti in bankruptcy court seeking a determination that the amount she owed to Solar Drive, LLC was non-dischargeable pursuant to 11 U.S.C. § 523.  (*Id.*, Pl. Resp. Ex. O, A325 ¶ E.)

In 2007, Ms. Giliberti's 50 percent tenant-in-common interest in Solar Drive was foreclosed upon by the beneficiary of one or more deeds of trust she had granted.  (*Id.* ¶ G.)

In early 2008, Ms. Giliberti was contacted by another lender willing to finance a buy-out of Mr. Devine's 50 percent interest in Solar Drive and to pay off the sums she owed.  Mr. Devine and Ms. Giliberti commenced negotiations regarding a purchase price and satisfaction of the amounts she owed him.  (*Id.*)  While the co-tenants were negotiating the details of the sale, the global financial crisis hit.

In November 2008, Mr. Devine, Solar Drive, LLC, and Ms. Giliberti entered into a Purchase and Settlement Agreement ("2008 Agreement") concerning Solar Drive.  The 2008 Agreement provided that "Devine provided the initial down payment for the purchase of the Property, fifty percent (50%) of which was deemed to be a loan to Giliberti."  (*Id.* ¶ B.)  Mr. Devine expended "more than $900,000 for the cost of such improvements" to Solar Drive, 50 percent of which "were by agreement of the parties considered to be a loan to Giliberti," and "fifty percent of all moneys paid by Solar Drive to support the Property, including but not limited to mortgage payments, property taxes and insurance, were by agreement of the parties considered to be a loan to Giliberti."  (*Id.*)

The 2008 Agreement stipulated that Ms. Giliberti would pay $4,500,000 to Solar Drive, LLC: $2,000,000 for the sale of Solar Drive, LLC's interest in the Property and $2,500,000 in full settlement of the claims in the adversary proceeding in bankruptcy court.  (*Id.* ¶ 1.)  Handwritten notations on the document reflect that the total payment amount was later changed to $4,400,000, reflecting a reduction of the amount to be paid in settlement of the adversary proceeding to $2,400,000.  (*Id.* ¶ 1(d).)

Of the $2,400,000 Ms. Giliberti agreed to pay in settlement of the adversary proceeding, the 2008 Agreement provided she would pay $1 million upon the closing of escrow.  (*Id.* ¶ 1(a).)  The remaining $1.4 million would be paid out in three separate tranches of $500,000, $500,000, and $400,000, under a payment schedule terminating 24 months after the close of escrow.  (*Id.* ¶ 1(a)-(e).)  The 2008 Agreement provided that the "indebtedness of [$1,400,000] to be paid as set forth in the previous subparagraphs (b), (c) and (d) shall accrue simple interest at the rate of 7.5% per year."  (*Id.* ¶ 1(e).)

If Ms. Giliberti failed to close escrow by February 27, 2009, Solar Drive, LLC would be entitled to a non-dischargeable judgment against her in the principal amount of $2,500,000, with interest accruing from the date a court entered judgment against her.  (*Id.* ¶ 9.)  On January 29, 2009, the bankruptcy court entered an order approving the Purchase and Settlement Agreement the parties executed.  (ECF 36, Def. Mot. Ex. 7, A192.)

Because of the 2008 financial downturn, the source of financing that Ms. Giliberti had secured in early 2008 was no longer viable, and, as a result, there was no possibility that she could obtain the financing to effectuate the purchase contemplated by the 2008 Agreement or to pay the sums she owed to Mr. Devine.  (ECF 39, Pl. Resp. Ex. U.)

On May 20, 2009, the United States Bankruptcy Court for the Central District of California entered judgment in favor of Mr. Devine and Solar Drive, LLC and against Ms. Giliberti in the amount of $2,500,000.  (ECF 36, Def. Mot. Ex. 7, A192.)  Mr. Devine filed a notice of renewal of that judgment in May 2019.  (*Id.* at A182.)

### C.    Amended 2008 Return and Refund Claim

In 2014, Mr. Devine filed tax returns for tax years 2008 through 2013 for the first time.  On April 8, 2016, he filed an amended 2008 return on Form 1040X claiming a business-bad-debt deduction for tax year 2008.  He also filed amended returns on Form 1040X for tax years 2003, 2004, 2005, 2006, and 2007, and a Form 1045 Tentative Claim for Refund.  (ECF 39, Pl Resp. Ex. D.)  His 2008 Form 1045 sought to carry back a NOL of $2,925,326.00 for the five preceding years.  (ECF 36, Def. Mot. Ex. 3, A014-20.)  He premised his claim on a provision of ARRA which provided a five-year carryback for a NOL incurred in 2008.

Mr. Devine sought the following refunds:

| Tax Year | Taxes Paid | Refund Sought |
|:--------:|:----------:|:-------------:|
| **2003** | $249,920 | $230,119 |

| 2004 | 305,216 | 280,010 |
|------|---------|---------|
| 2005 | 246,692 | 211,701 |
| 2006 | 244,565 | 167,063 |
| 2007 | 94,272 | 20,726 |

(ECF 1, Compl. ¶¶ 21-25, 39.)

In May 2016, the IRS notified the plaintiff that his claim to elect the five-year carryback period under ARRA was untimely because it "had to be filed on or before Oct. 15, 2009." (ECF 39, Pl. Resp. Ex. E, A289.) The IRS did not dispute that the plaintiff might be entitled to a business-bad-debt deduction under I.R.C. § 166. (*Id.*) The IRS requested that he submit further information and adjust the claim to seek a refund only for tax years 2006 and 2007, using the standard two-year carryback. (*Id.*) The IRS correspondence acknowledged that the carryback claims for tax year 2008 had been timely.

In correspondence in January 2017, the IRS Appeals Office disallowed Mr. Devine's claim for a refund for tax years 2003, 2004, and 2005, but granted his appeal with respect to tax years 2006 and 2007 and accepted his refund claim. (*Id.*, Pl. Resp. Ex. H.) In February 2017, the IRS issued a check for tax year 2006 in the amount of $255,237.21, reflecting a refund of $232,312.00 in tax and overpayment interest of $22,925.21. (*Id.*, Pl. Resp. Ex. L.) The IRS also issued the plaintiff a check for tax year 2007 in the amount of $27,593.41, reflecting a refund of $25,115.00 in tax and overpayment interest of $2,478.41. (ECF 15, Def. Ans. ¶¶ 8, 19.)

### D.    Procedural History

On June 19, 2018, the plaintiff filed suit in this court seeking a refund for tax years 2003, 2004, and 2005 based on a 2008 NOL and a five-year carryback as provided by ARRA. On September 26, 2018, the defendant filed its answer and two counterclaims seeking the return of allegedly erroneous refunds the IRS had issued to the plaintiff for tax years 2006 and 2007. The defendant now moves to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), claiming the plaintiff's suit is untimely. The defendant also moves for summary judgment on the plaintiff's claims under RCFC 56. In the event the Court grants the motion to dismiss the defendant also moves for a transfer of its counterclaims to the Central District of California. The matter has been fully briefed, and the Court held oral argument on December 10, 2020. The Court offered the parties the opportunity to submit supplemental briefs after the argument, but neither party did so.

## II.    JURISDICTION AND STANDARD OF REVIEW

The defendant argues that this Court should dismiss the plaintiff's refund claims for lack of subject matter jurisdiction under RCFC 12(b)(1) due to untimeliness. Because subject matter jurisdiction is a "threshold matter" that must be addressed before reaching the merits of the

plaintiff's claims, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), the Court proceeds by first determining whether it may exercise jurisdiction over the plaintiff's claims.

### A.      Standard of Review: Dismissal Under RCFC 12(b)(1)

Jurisdiction is "power to declare the law."  *Id.*, citing *Ex parte McCardle*, 7 Wall. 506, 514 (1868). The Court "is bound to ask and answer for itself [the jurisdiction question], even when not otherwise suggested, and without respect to the relation of the parties to it."  *Id.*

To determine jurisdiction, the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  *Id.*  If the plaintiff cannot meet this burden, the court must dismiss the action for lack of jurisdiction. RCFC 12(h)(3).

"When subject matter jurisdiction is questioned, the court . . . may resolve factual disputes."  *Prakash v. American University*, 727 F.2d 1174, 1180 (D.C. Cir. 1984).  "Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged."  *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999); *see also Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) (noting that if a motion "challenges the truth of the jurisdictional facts alleged in the complaint, the [trial] court may consider relevant evidence in order to resolve the factual dispute").  The court may consider evidence outside of the pleadings in order to determine its jurisdiction, including declarations, affidavits, evidentiary hearings, or otherwise.  *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991); *Rogers v. United States*, 95 Fed. Cl. 513, 514 (2010).

### B.      Jurisdiction

This Court has jurisdiction over claims "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . or of any sum alleged to have been excessive or in any manner wrongfully collected" only when "a claim for refund or credit has been duly filed with the Secretary" according to applicable laws and regulations. I.R.C. § 7422(a).

### 1.      Refund Claims Under I.R.C. § 6511(a)

A claim for refund of a tax payment must be filed "within the time limits imposed by [I.R.C.] § 6511(a)."  *United States v. Dalm*, 494 U.S. 596, 602 (1990).  Section 6511 provides that a taxpayer must file a claim for refund with the IRS "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid."  I.R.C. § 6511(a).

Mr. Devine did not file a refund claim within the time limit imposed by § 6511(a).  He filed his refund claim in April 2016, more than three years from filing his tax returns for tax year 2003 (filed in 2004), 2004 (filed in 2006), and 2005 (filed in 2007).  His refund claim was also

filed more than two years from the time the tax was paid.  His claim is therefore not timely under I.R.C. § 6511(a).

### 2.      Refund Claims Under I.R.C. § 6511(d): Business-Bad-Debt Claims

Section 6511(d) sets forth an extended limitation period for filing a refund claim when the taxpayer seeks a refund related to a business-bad-debt deduction.  Section 6511(d)(1) provides that if the refund claim concerns "the deductibility by the taxpayer, under section 166 or section 832(c), of a debt as a debt which became worthless, . . ." then:

> in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 7 years from the date prescribed by law for filing the return for the year with respect to which the claim is made.  If the claim for credit or refund relates to an overpayment on account of the effect that the deductibility of such a debt or loss has on the application to the taxpayer of a carryback, the period shall be either 7 years from the date prescribed by law for filing the return for the year of the net operating loss which results in such carryback or the period prescribed in paragraph (2) of this subsection, whichever expires the later.

I.R.C. § 6511(d)(1).  The reference to paragraph (d)(2) is not relevant to this case.

For a taxpayer to take advantage of the extended seven-year statute of limitations of I.R.C. § 6511(d), the statute expressly requires that the taxpayer's refund claim seek a deduction for a bad business debt under I.R.C. § 166.  Section 166 permits an individual taxpayer to deduct in full, against ordinary income, a business bad debt that becomes worthless and to deduct that debt against ordinary income for other years as a NOL carryback or carryover.  *Estate of Mann v. United States*, 731 F.2d 267, 272 n.7 (5th Cir. 1984).  Non-business debt, in contrast, is treated as a short-term loss subject to limitations on deductibility.  *See* I.R.C. §§ 1211, 1212; *United States v. Generes*, 405 U.S. 93, 96 (1972).

Mr. Devine filed his tax return claiming a business-bad-debt deduction on April 11, 2016, which is within seven years of April 15, 2009, the deadline for filing a return for tax year 2008.  His refund claim would therefore be timely under I.R.C. § 6511(d).  The plaintiff bears the burden, however, of demonstrating that he satisfies the requirements for an election under I.R.C. § 166—namely, that he had a business bad debt that became worthless in 2008—in order to take advantage of the extended limitations period of I.R.C. § 6511(d).  Should the plaintiff not satisfy the requirements for claiming a business bad debt, his refund claim would be untimely, and the Court would be unable to exercise jurisdiction.

The initial point of decision, therefore, is whether the plaintiff has carried his burden of showing by a preponderance of the evidence that his claim is for a business bad debt such that he is able to demonstrate that it is timely and that the Court has jurisdiction to entertain it.

### III.   DISCUSSION

The plaintiff seeks to carry back a NOL from 2008 to tax years 2003-2005 under I.R.C. § 6511(d).  To do so he must establish a legal claim to a business-bad-debt deduction.  The plaintiff therefore must demonstrate that: (1) he had a bona fide debt; (2) that debt was a business debt; and (3) that debt became worthless in 2008.  *See* I.R.C. § 166; 26 C.F.R. § 1.166-1(c).

### A.   Business-Bad-Debt Deduction: Bona Fide Debt

#### 1.   Legal Standard

For Mr. Devine to seek a deduction for a bad business debt owed to him, the debt must be a bona fide debt.  A bona fide debt under I.R.C. § 166 is "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."  26 C.F.R. § 1.166-1(c).  A contribution to capital is not considered a debt.  *Id.* "Advances made by an investor to a closely held or controlled corporation may properly be characterized, not as a bona fide loan, but as a capital contribution."  *Rutter v. C.I.R.*, T.C. Memo 2017-174, 2017 WL 3974095, at *6.

The distinction between debt and equity has engendered a great deal of dispute over the years due to the distinctive tax treatment of each.  *See, e.g., A.R. Lantz & Co. v. United States*, 424 F.2d 1330, 1331 (9th Cir. 1970).  The analysis of whether advances of funds should be treated as debt or equity "must be considered in the context of the overall transaction."  *Hardman v. United States*, 827 F.2d 1409, 1411 (9th Cir. 1987).

Courts have used a variety of factors to determine whether a bona fide debt exists between two parties such as would create a relationship between them as debtor and creditor.  The focus of the inquiry is on the intent of the parties.  *A.R. Lantz*, 424 F.2d at 1333.

> The Ninth Circuit has developed a test that identifies 11 "factors which to varying degrees influence the resolution of the debt-equity issue."  *Id.*  These factors are: (1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation [in] management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between debtor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions.

*Hardman*, 827 F.2d at 1412 (citations omitted).

In an earlier case involving an individual taxpayer, the Ninth Circuit applied a test of six factors: (1) the existence of a contingency upon which the obligation to repay relies that has not occurred; (2) the absence of a fixed maturity date; (3) a lack of a note or other evidence of

9

indebtedness; (4) a provision for interest or security; (5) evidence that the creditor ever made a demand for repayment; and (6) an indication that the creditor continued to advance money long after he could have reasonably believed there was any possibility of repayment. *Zimmerman v. United States*, 318 F.2d 611, 613 (9th Cir. 1963).

Other courts have also considered various lists of factors set forth in the context of determining whether funds advanced to a corporation by a shareholder should be construed as debt or equity, and consequently whether reimbursement constitutes loan repayment or dividend distributions. *E.g., Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972).

The Ninth Circuit has more recently engaged in a thorough elucidation of its governing test of determining debt or equity. In *Hewlett-Packard*, the court distinguished between the intent-based test favored by the Ninth Circuit and a simpler conception that would merely ask whether an instrument *functions* more like debt or equity, ultimately concluding that the two tests will often merge. *Hewlett-Packard Co. v. C.I.R.*, 875 F.3d 494, 498-99 (9th Cir. 2017). The court explained that its test:

> is "primarily directed" at determining whether the parties subjectively intended to craft an instrument that is more debt-like or equity-like. A quest for subjective intent always requires objective evidence, hence the eleven factors. On this account, all factors on the list could be described as "evidence of intent." Direct, objective evidence of intent—say, an e-mail from an executive stating he wishes to create an unalloyed debt instrument—is one of the eleven, and it matters. But assertions of intent don't resolve our inquiry, which considers all the "circumstances and conditions" that speak to subjective intent. Proclaiming an intent to create an instrument that is "debt" or "equity" doesn't make it so.
>
> [The Ninth Circuit's] precedent's preoccupation with intent is nonetheless a little puzzling, since it suggests that a taxpayer could achieve debt treatment for an instrument that functions as equity (or vice versa), so long as he had the right state of mind in crafting the instrument. Were we writing on a barren slate, we might say that our test is simply directed at determining whether an instrument functions more like debt or equity. There's nothing magical about intent. Nonetheless, we believe our circuit's roundabout intent-based test merges with this simple function test in all but a few outlandish cases.

*Id.* (citations omitted).

In seeking to determine the taxpayer's intent and the way the instrument functions, the factors set forth in these cases are not of equal significance, and no single factor is determinative. *Recklitis v. C.I.R.*, 91 T.C. 874, 901-02 (1988). Courts instead examine each case on its facts and apply and evaluate the factors most significant to the issues at hand. *See A.R. Lantz,* 424 F.2d at 1333 (explaining that resolution of debt–equity question "depends on the facts of each case").

As the Third Circuit has explained, the factors developed by various courts serve as "aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968). In this summary of the test, *Fin Hay* neatly encapsulates *Hewlett-Packard*'s functionality test.

There is a dispute among courts as to whether the characterization of an advance as either a debt or a contribution to capital presents primarily a question of law or of fact. The Fifth and Eleventh Circuits treat the issue as a legal question. *See Texas Farm Bureau v. United States*, 732 F.2d 437, 438 (5th Cir. 1984); *In re Lane*, 742 F.2d 1311, 1315 (11th Cir. 1984). The Ninth, Fourth, and Sixth Circuits treat the issue as primarily a factual question. *See Bauer v. C.I.R.,* 748 F.2d 1365, 1367 (9th Cir. 1984); *Jewell Ridge Coal Corp. v. C.I.R.*, 318 F.2d 695, 698 (4th Cir. 1963); *Indmar Prods. Co. v. C.I.R.*, 444 F.3d 771, 777 (6th Cir. 2006). The D.C. Circuit has effectively found the inquiry to be a mixed question of applying facts to a fact-specific legal standard. *Cerand & Co., Inc. v. C.I.R.*, 254 F.3d 258, 260 (D.C. Cir. 2001). The Court has found no case from the Federal Circuit elaborating the nature of the issue before the Court.

Because Mr. Devine is a resident of California and all relevant acts occurred there, the Court will apply the Ninth Circuit's law and treat the question as one of fact. Ultimately, the characterization of the debt–equity question as one of fact or law, or a mixed question, is not determinative of the outcome in this case. The Court would reach the same conclusion under any of these standards.

While the issue before the Court ultimately depends on the plaintiff's intent, that intent is susceptible to resolution at this stage of the case based on the contract between the plaintiff and Ms. Giliberti, if that contract is unambiguous. Indeed, the Court must resolve the question, because jurisdiction over the plaintiff's refund claim depends on its outcome. The Court has reviewed the documentation relevant to resolving the nature of the plaintiff's advances; namely, the Co-Tenancy Agreement and the Side Letter (collectively, "the 2004 Agreements") between Mr. Devine and Ms. Giliberti. This documentation, by its own terms, is the sole contract between the parties from the time they executed the 2004 Agreements.

The interpretation of an unambiguous contract is a question of law. *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1199-1200 (Fed. Cir. 2006); *In re U.S. Fin. Sec. Litig.*, 729 F.2d 628, 632 (9th Cir. 1984). Contact interpretation requires a determination of the parties' intent, *Shell Oil Co. v. United States*, 751 F.3d 1282, 1304 (Fed. Cir. 2014), but that intent is found within the text of the contract itself when that instrument is unambiguous. When a contract is ambiguous, it may be interpreted by considering extrinsic evidence. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006). An ambiguity begins a shift in contract interpretation from a question of law to one of fact. *See CITGO Asphalt Refin. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1088 (2020) (noting that "when a written contract is ambiguous, its meaning is a question of fact, requiring a determination of the intent of the parties in entering the contract; that may involve examining relevant extrinsic evidence of the parties' intent and the meaning of the words that they used") (quoting 11 Williston on Contracts § 30:7) (internal quotations omitted).

The Court finds the documents constituting the full scope of the 2004 Agreements between Mr. Devine and Ms. Giliberti to be unambiguous.  The Court can resolve their effect as a matter of law. The Court therefore may also evaluate the expectations of the parties to the contract and the factual questions stemming therefrom to inform its jurisdictional inquiry.  *See Martinez v. United States*, 48 Fed. Cl. 851, 857 (2001) (noting in the context of evaluating jurisdictional facts that "the court may, and often must, find facts on its own"), *aff'd in relevant part*, 281 F.3d 1376 (Fed. Cir. 2002).

As discussed above, the Court must evaluate the arguments in support of a business-bad-debt deduction as jurisdictional facts that assist the Court in determining whether jurisdiction to consider the plaintiff's claim exists.  The resolution of the debt-equity question and the interpretation of the unambiguous controlling documents, whether viewed as either questions of fact or of law, are merely relevant factual evidence "in order to resolve the factual dispute" at hand—namely, to assess whether the case is within the ambit of the Court's jurisdiction. *Rocovich*, 933 F.2d at 994.  Thus, the overall inquiry remains a factual one, even when the Court makes preliminary legal determinations in support of its factual findings.

## 2.   Analysis

The taxpayer bears the burden of proof to establish that "a purported debt is in substance and fact a debt for tax purposes."  *VHC, Inc. v. C.I.R.*, T.C. Memo 2017-220, 2017 WL 5157771, at *17.  This burden is consistent with the plaintiff's burden to demonstrate jurisdiction.

The Court recognizes that Ms. Giliberti had an obligation to repay the advances Mr. Devine contributed to the Solar Drive project.  Nevertheless, no bona fide debt existed for tax purposes.  The Court finds few indicia that the parties established a debtor-creditor relationship, as evidenced most significantly by the lack of evidence of indebtedness, the parties' own intent and expectations, and the lack of interest sought or paid.

### a.   Evidence of Indebtedness

The Court begins its analysis of the relevant facts with the agreement between Mr. Devine and Ms. Giliberti, which is to be interpreted in order to give effect to the intent of the parties at the time the 2004 Agreements were executed.  Cal. Civ. Code § 1636.  The Court looks to California law to determine the intent of the parties to the agreement because the parties stipulated in the 2004 Agreements that any disputes would be resolved under California law.

Mr. Devine and Ms. Giliberti expressly contemplated that one co-tenant might incur a debt to the other co-tenant by making loans in support of the Solar Drive project and provided for such events.  The co-tenants signed a Side Letter on May 6, 2004 and incorporated into their Side Letter their Co-Tenancy Agreement, contemporaneously with the purchase of Solar Drive.

The Co-Tenancy Agreement provides in paragraph five that "[n]o Co-Owner may advance funds to another Co-Owner to meet expenses associated with that Co-Owner's Ownership Interest, unless the advance is recourse to the Co-Owner and is for a period not to

exceed 31 days.  Such advances shall be evidenced by a Promissory Note containing a market rate of interest."  (Pl. Resp. Ex. B ¶ 5.)

The Side Letter provides in paragraph 6 that:

> In the event the Co-Owners execute promissory note(s) between the two of them and said promissory note(s) relate to the Property (the "Promissory Note"), the maker under the Promissory Note shall have the one time option to extend the due date of the Promissory Note for 31 days by delivering written notice to the payee prior to the due date stated in the Promissory Note.  All Promissory Notes shall be paid in full upon the due date stated in the Promissory Note or the sale or refinance of the Property, whichever shall come first. In the event of a sale or refinance of the Property, any unpaid Promissory Notes shall be paid directly from the escrow that receives the proceeds of the refinance or sale.

(Pl. Resp. Ex. C ¶ 6.)  Both documents include an integration clause that establishes the 2004 Agreements as the sole agreement between the parties.

Based on these provisions, the parties understood at the time they entered into the 2004 Agreements the significance of promissory notes and contemplated their use in relation to the Solar Drive project.  The parties' express agreement is the best indicator of their contemporary intent regarding the nature of the payments Mr. Devine was advancing.  The parties made express provision that when Mr. Devine advanced funds to meet the expenses of Ms. Giliberti, thereby incurring debt, such advances would be captured in promissory notes on which market-rate interest was due, payable within 31 days (except as the payment deadline may be extended pursuant to paragraph 6 of the Side Letter).  The parties' 2004 Agreements specifically forbid advances of funds made in the absence of the execution of promissory notes.  Under the 2004 Agreements, Mr. Devine's advances were understood by the parties to be infusions of capital to the Solar Drive project as a whole and not debts from one partner to the other.

No promissory note or other documentation setting forth a payment obligation was executed by the parties in connection with the funds advanced by Mr. Devine.  "The issuance of promissory notes may suggest that advances are debt."  *VHC, Inc. v. C.I.R.*, 2017 WL 5157771, at *18; *see also Zimmerman*, 318 F.2d at 613.  The "absence of a formal loan agreement is not determinative, but the absence of a formal loan agreement is certainly relevant."  *DF Systems, Inc. v. C.I.R.*, 548 F. App'x 247, 249 (5th Cir. 2013).

The absence of any formal loan agreements is especially relevant when Mr. Devine signed the 2004 Agreements that explicitly contemplated the use of promissory notes for loans between the parties.  The 2004 Agreements reflect that he understood what a promissory note was and how it would be used in relation to the Solar Drive project.  His acumen as a senior music industry executive, his employment of a bookkeeper for his real-estate business, and the assistance he received from lawyers in drafting the Side Letter suggest that he had the resources at his disposal to execute a promissory note or similar documentation.  *Cf. Recklitis*, 91 T.C. at

13

902 (declining to impute a debt instrument in the transaction given that the taxpayer was a "highly sophisticated businessman" who was "fully cognizant of the significance of a formally executed note and underlying security to a lender").  Mr. Devine, however, has put forth no evidence that a promissory note or any similar loan agreement was executed to create a debtor-creditor relationship between Ms. Giliberti and himself.

The plaintiff suggests that the 2004 Agreements themselves constitute a loan agreement because the Co-Tenancy Agreement designates 50 percent of all amounts advanced by Mr. Devine as a loan.  One looks in vain for such an express provision or combination of provisions in the 2004 Agreements, and the Court finds no basis on which to affirm the plaintiff's assertion in this regard.  The 2004 Agreements do not refer to a loan amount, a maturity date for the alleged loans, a rate of interest (except, as previously noted, to be paid on any promissory notes executed pursuant to the Side Letter), a right of enforcement, or other attributes typically reflected in a loan agreement.

Even if such an inference could be drawn from the express terms of the 2004 Agreements, the Court finds that the 2004 Agreements are insufficient on their own to support the weight the plaintiff seeks to attach to them when they expressly contemplated a further step: the execution by the co-tenants of a promissory note or notes in support of any "loans."

In the absence of any contemporaneous documentation satisfying the express terms of the parties' own 2004 Agreements evidencing that the funds advanced were loans, as opposed to capital investments, the Court finds that this factor weighs against finding that the plaintiff intended to incur a bona fide debt.

**b.    Parties' Intent**

On the question of the parties' intent at the time they entered into the 2004 Agreements, it is helpful to evaluate the co-tenants' expectations at the time of execution.  As the 2004 Agreements have a choice-of-law clause that identifies California law as governing the parties' agreement, the Court turns to local law to determine the co-tenants' reasonable expectations at the time of execution and what they intended in signing the document.

In this case, local law proves useful in determining the context underlying the 2004 Agreements.  Under California law, co-tenants who have assented to improvements are liable for funds expended by the other in excess of the co-tenant's fractional share of the property. *Higgins v. Eva*, 204 Cal. 231, 267 (1928); *Wallace v. Daley*, 220 Cal. App. 3d 1028, 1036 (1990); *Shenson v. Shenson,* 124 Cal. App. 2d 747, 754-55 (1954); *Mercola v. Chester*, 97 Cal. App. 2d 140, 143 (1950).  Indeed, the California Supreme Court has held that the "right of a cotenant making the payment in excess of his proportion to recover payment from the other cotenant his share thereof arises at the date when any such expenditure is made." *Willmon v. Koyer*, 168 Cal. 369, 372-73 (1914).

The co-tenants created the 2004 Agreements against the backdrop of existing state law that provided to Mr. Devine the full protection of law to ensure the reimbursement of his financial advances under the 2004 Agreements.  California law provided all the protection

needed to guarantee Mr. Devine repayment of funds advanced as capital to the Solar Drive
project. As the 2004 Agreements recognized by their express terms, only if one co-owner loaned
funds to the other for the purpose of meeting "expenses associated with that Co-Owner's
Ownership Interest," as recounted by the Co-Tenancy Agreement, was there otherwise a need for
a promissory note and recourse debt. The latter is the only type of loan expressly accounted for
in the 2004 Agreements, and no such loans were made.

### c.      Interest

Also significant is the lack of any provision for the payment by Ms. Giliberti of interest
on the funds advanced by Mr. Devine. "[A] true lender is concerned with interest." *Curry v.
United States*, 396 F.2d 630, 634 (5th Cir. 1968); *see also Sellers v. C.I.R.*, T.C. Memo 2000-
235, 2000 WL 1061224, at *7 ("Failure of the putative lender to insist on interest payments
suggests that he is instead interested in the . . . increased market value of his ownership interest,
thereby indicating equity contributions."); *Slappey Drive Indus. Park v. United States*, 561 F.2d
572, 582 (5th Cir. 1977) (noting that, in the case of shareholder loans to a corporation, when "a
corporate contributor seeks no interest, it becomes abundantly clear that the compensation he
seeks is that of an equity interest; a share of the profits or an increase in the value of his
shareholdings"). A provision for interest or security is one of the factors identified in
*Zimmerman* and often cited by the Tax Court. *See, e.g., Estate of Lockett v. C.I.R.,* T.C. Memo
2012-123, 2012 WL 1434988, at *7; *Vinikoor v. C.I.R.*, T.C. Memo 1998-152, 1998 WL 201755,
at *4; *Miller v. C.I.R.,* T.C. Memo 1996-3, 1996 WL 10259, at *7.

The reason courts look to whether a purported lender charged interest is that the use of
money is not free. By advancing funds to the Solar Drive project, Mr. Devine was losing the use
of those funds for other purposes. That is always true: money used for one purpose is not
available for another purpose. As a result, those who lend money charge interest to cover the
cost to themselves of the money's unavailability. Charging interest is the norm when a person
makes a loan. If a person is putting in equity, however, interest is not charged, because the
whole aim of advancing the funds as equity is to increase the overall value of the investment; the
profit on the loss of the use of the money will in theory be more than covered by the increase in
the value of the investment.

Perhaps if Ms. Giliberti were a member of Mr. Devine's family or a friend of long
standing or had some other personal relationship with him, the absence of interest on the
advances could be explained away (although such cases require special attention to ascertain
whether the advances are actually gifts). Perhaps, on the other hand, the absence of interest
could be explained if Mr. Devine were extending loans for only a brief period, rendering the cost
to him of foregoing use of his own money negligible. Neither scenario is the case. The two co-
tenants met in connection with the Solar Drive project. Their relationship was an arm's length,
business partnership. In such a case, it is hard to conceive of one partner making loans to the
other without any provision for interest, and the plaintiff does not try to explain it.

Instead, the plaintiff argues that the Co-Tenancy Agreement does provide for interest:
any advance would be "evidenced by a Promissory Note containing a market rate of interest."
(Pl. Resp. Ex. B.) The plaintiff's argument on this point cannot stand, however, because he

never exercised his right under this provision.  Ms. Giliberti and Mr. Devine never executed any promissory notes reflecting recourse debt at market interest rates for the funds he advanced.

The Court recognizes that during later proceedings between the former co-tenants Mr. Devine made a claim for interest on his advances.  In Ms. Giliberti's bankruptcy proceeding, Mr. Devine filed a proof of claim evidencing the funds she owed to him and Solar Drive, LLC.  (Pl. Resp. Ex. N.)   The claim listed numerous categories of debts, including 50 percent of the costs of insurance, labor, and mortgage payments.  The claim sought, in relation to those debts, "[i]nterest on the foregoing at the maximum rate allowed by law."  (*Id.*)  The 2008 Agreement that the co-tenants executed to settle the plaintiff's claim against Ms. Giliberti also noted that payments due to Mr. Devine under its terms "shall accrue simple interest at the rate of 7.5%." (Pl. Resp. Ex. O.)  The Court evaluates the 2008 Agreement in more detail below.

While his later demands for the payment of interest demonstrate that Mr. Devine did seek to recover interest charges on his advances, there is no evidence to suggest that the co-tenants expected to pay interest and set an interest rate for Mr. Devine's advances at the time he made them.  The *post hoc* demand for interest came after the parties' relationship had soured; they were adversaries in 2008 on the amounts allegedly due to him to settle subsequent litigation does not create any ambiguity with respect to the 2004 Agreements sufficient to support a claim that Mr. Devine sought interest from the outset at the time he made the advances, beginning in 2004, as a true lender would have.

### d.    Additional Factors

Not only are no certificates of indebtedness to be found in the record, and no interest charges levied at the time the funds were advanced, but there is no maturity date for the alleged loans.  Again, the 2004 Agreements provided for a maturity date for any loans reflected by promissory notes between the co-tenants, but no such notes were executed.  Otherwise, the advances were made with no set repayment date.  Mr. Devine's and Ms. Giliberti's 2004 Agreements reflect an intent to refinance the mortgage on Solar Drive and to use the proceeds from the refinancing to "reimburse the Co-Owners for any monies they spent to improve or repair the property . . . ."  (Pl. Resp. Ex. C ¶ 4.)  While the 2004 Agreements evince the intent of the parties to those agreements to reimburse Mr. Devine for his advances, they contain no fixed date of repayment.  Whether the parties contemplated reimbursing Mr. Devine from rental proceeds, refinancing the property, or selling Solar Drive, these events were all aspirational at the time the 2004 Agreements were entered into and Mr. Devine advanced the monies to improve the property.  The aspiration to repay him for his advances without any fixed or target date by which to do so is more reflective of equity advances than it is of loans.

As far as Mr. Devine's ability to enforce his right to repayment of principal and interest, such a right inured to him due to his role as co-tenant. He enjoyed no special right or priority under the 2004 Agreements, however, to enforce payment of the principal, as the 2004 Agreements provided no additional or specific right to enforce repayment, except to the extent such payments had been made pursuant to the express provision of making a recourse loan to Ms. Giliberti reflected in promissory notes.  As the 2004 Agreements recognized, lien holders on the Solar Drive property, *i.e.*, outside lenders, had senior rights to payment on their loans before

the co-tenants would be "reimburse[d] . . . for any monies they spent to improve or repair the property." (*Id.* ¶¶ 4, 6.)

Under the 2004 Agreements, the obligations owed to Mr. Devine were expressly subordinated to lenders. The absence of any special or priority right of enforcement additional to Mr. Devine's right as co-tenant under California law and the subordination of his right to repayment for the funds he advanced weigh against treating those advances as loans and support treating them as equity investments.

Another factor supporting the conclusion that the monies advanced by Mr. Devine were investments and not loans is the fact that he continued to provide funds for Solar Drive even after the deterioration of his relationship with Ms. Giliberti. At that point in the arrangement, Mr. Devine would have had more than an inkling that she was not likely to repay the advances; his chance to recoup his money was by enhancing the value of the Solar Drive property by continuing to make improvements. (*See* ECF 36, Def. Mot. Ex. 3, A026 (demonstrating that Mr. Devine advanced funds to the Solar Drive project in 2007 and 2008, after Ms. Giliberti had filed for bankruptcy in 2006).) *See Zimmerman*, 318 F.2d at 613 (noting that one factor is whether the creditor reasonably believed there was any possibility of repayment); *LeBloch v. C.I.R.*, T.C. Memo 2007-145, 2007 WL 1670389, at *10 (finding that the parties' working relationship created an understanding that funds advanced to one another would be repaid), *rev'd in part on other grounds*, 311 F. App'x 960 (9th Cir. 2009); *cf. Montgomery v. United States*, 87 Ct. Cl. 218, 230 (1938) (denying a deduction when the creditor knew the debtor's business was struggling).

Other factors from the Ninth Circuit test are also suggestive that the advances were investments in the property and not loans from Mr. Devine to Ms. Giliberti: (1) the Solar Drive project had difficulty obtaining other financing; and (2) the monies to repay Mr. Devine's advances were intended to come from loans obtained by refinancing the Solar Drive property.

On the other hand, countering the weight of the factors analyzed thus far, several facts may be construed to support the plaintiff's claim. Although the advances were unsecured, under the 2004 Agreements Mr. Devine could rely on Ms. Giliberti's 50 percent ownership interest in the property itself as security; that reliance was equally based, as noted, on California's law on co-tenancy and insufficient to counter the factors previously discussed. The plaintiff also made multiple demands for repayment, including ultimately having to pursue adversary proceedings in bankruptcy court. In addition, the obligation to repay was not subject to any contingency that had not occurred. *See Zimmerman*, 318 F.2d at 613 (considering such factors as whether there was any provision for security, demand for repayment, or whether the obligation to repay was subject to a contingency). Even weighed together in the balance, however, these factors are insufficient to enable the plaintiff to carry his burden of showing by preponderant evidence that his claim may take advantage of the extended statutes of limitation he seeks to invoke.

Mr. Devine, as co-owner of half the property, expressly had an equal role in managing the Solar Drive project under paragraph 2 of the Co-Tenancy Agreement. Flowing out of his equal ownership interest, his role in managing the property does not appear to have depended on the monies he advanced, whether they were equity or debt. This factor is neutral.

### 3.      Effect of 2008 Purchase and Settlement Agreement

The 2008 Agreement between Mr. Devine and Ms. Giliberti offers the most significant support for the plaintiff's position.  In it, as previously noted, the two co-tenants agreed that half of the funds supplied by Mr. Devine for the down payment on Solar Drive "was deemed to be a loan" to Ms. Giliberti.[3]  In an arrangement between two individuals, it is those individuals themselves who determine whether funds are equity or debt, as long as the objective indicia support that determination.  *See Hewlett-Packard*, 875 F.3d at 498-99.  In the 2008 Agreement, the two parties to the 2004 Agreements specifically characterize a portion of Mr. Devine's advances under the 2004 Agreements as debt to Ms. Giliberti.  That characterization is entitled to deference, and if the 2004 Agreements could be read in any way to create a question regarding the nature of Mr. Devine's advances, that 2008 characterization of the funds he advanced would provide probative evidence that would support the plaintiff's position.

The problem for the plaintiff is that the 2004 Agreements, as analyzed above, offer no support for the characterization in the 2008 Agreement that Mr. Devine's advances did in fact function as debt to Ms. Giliberti.  The 2008 Agreement between the parties is extrinsic and not contemporaneous with the 2004 Agreements under which Mr. Devine advanced funds.  Its belated expression of the parties' intent is not consistent with the unambiguous terms of the 2004 Agreements, which the parties to it specifically acknowledged therein represented the totality of their agreement.  In the face of the unambiguous terms of the 2004 Agreements, the extrinsic evidence of the 2008 Agreement may not be used to interpret the earlier 2004 Agreements.  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012) (noting that the court must exclude extrinsic evidence for an unambiguous contract); *McAbee Const. Inc. v. United States,* 97 F.3d 1431, 1434-35 (Fed. Cir. 1996); *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (1968).

In addition, while the intent of the parties is central to the analytical framework of the Ninth Circuit, that intent must match the "function" of the investment, *Hewlett-Packard*, 875 F.3d at 498-99, or its "economic reality," *Fin Hay*, 398 F.2d at 697.  In this instance, as explained above, the parties' intent, at least as expressed in 2008, is inconsistent with the function and economic realities of Mr. Devine's investments pursuant to the 2004 Agreements in the Solar Drive project.

---

[3] In bankruptcy, equity can be recharacterized as debt.  *In re L. Scott Apparel, Inc.,* 615 B.R. 881, 888 (C.D. Cal.), *appeal dismissed*, 2020 WL 6492082 (9th Cir. 2020); *In re Daewoo Motor America, Inc.*, 471 B.R. 726, 729 (C.D. Cal. 2012), *aff'd*, 564 F. App'x 638 (9th Cir. 2014).  The 2008 Agreement does not purport to change prospectively the nature of Mr. Devine's advances, converting equity to debt from the date of that Agreement.  Had that been the case, the issue before the Court in this case would be different.  Instead, the 2008 Agreement seeks to characterize retrospectively the advances as of the date they had been tendered and not to recharacterize them going forward.

For these reasons, the characterization of Mr. Devine's initial contributions to the Solar Drive project as "debt" in the 2008 Agreement fails to provide evidence contemporaneous with his advances to contradict the factors evaluated by the Court previously and therefore does not satisfy Mr. Devine's burden of demonstrating that the Court has jurisdiction over the case.

The 2008 Agreement could not recharacterize the underlying nature of Mr. Devine's advances to Ms. Giliberti, although it could have changed the nature of that obligation from that date forward. It did not do so. The 2008 settlement of his claim against Ms. Giliberti arising from Mr. Devine's advances also did not constitute a new loan to Ms. Giliberti, but the resolution of his suit against her. The 2008 Agreement thus did not serve to create a loan of the sort this Court could recognize as a valid debt.

The 2008 Agreement instead functions as a settlement to litigation. It establishes a schedule under which Ms. Giliberti will pay Mr. Devine the damages she agrees are due him. She may have been willing retroactively to agree with Mr. Devine in characterizing the nature of the basis on which damages were due, but that willingness does not on its own alter the objective characterization of the advances at the times they were made for the reasons previously outlined.

The 2008 Agreement also contains provisions for the payment of interest as well as fixed dates by which Ms. Giliberti had to provide payment to Mr. Devine. While those are attributes of debt, as opposed to equity, they are irrelevant to the issue before the Court. The 2008 Agreement resolves litigation between Mr. Devine and Ms. Giliberti. In effect, it provides for a structured settlement of his claims against her. The schedule provided in the 2008 Agreement does not provide fixed maturity dates for repayments of debt obligations but rather provides a schedule for payment of damages. Likewise, the interest provided for in the 2008 Agreement is not interest payable on funds loaned by Mr. Devine to Ms. Giliberti, but rather compensation due because Ms. Giliberti was unable to pay the full amount of the damages at the time she agreed to settle Mr. Devine's claims against her, costing Mr. Devine the time-value of that unpaid portion of the damages due.

The provisions of the 2008 Agreement do not affect and in no way alter the Court's conclusion that the 2004 Agreements between Mr. Devine and Ms. Giliberti did not establish a debtor-creditor relationship between the two co-tenants on the Solar Drive project.

### 4.    Conclusion

Because there was no bona fide debt, the Court need not address whether the debt was a business bad debt or whether it became worthless in 2008. Without a bona fide debt, the plaintiff *a fortiori* cannot demonstrate that he had a business bad debt pursuant to I.R.C. § 166. As he does not qualify for the deduction, he cannot rely upon the statute of limitations of I.R.C. § 6511(d), which extends the time to file a refund claim only for valid business-bad-debt deductions under § 166. The plaintiff's refund claim is therefore untimely, and this Court has no jurisdiction to consider it. The Court must dismiss the plaintiff's claim under RCFC 12(b)(1) and 12(h)(3).

### B.    Additional Issues

The parties have raised several additional issues in this case.  The plaintiff challenges the IRS's implementation of ARRA, the statute that permits a five-year carryback for a 2008 NOL, under the Administrative Procedure Act.  He argues that a 2009 IRS Revenue Procedure implementing the relevant provision of ARRA for filing a refund claim was not properly promulgated.

The defendant challenges the plaintiff's 2008 NOL deduction on the theory of the duty of consistency.  Mr. Devine had previously claimed a $3,000,000 loss, to which the IRS acquiesced, in relation to Solar Drive at the time of the property's sale in 2011.  The defendant argues that the plaintiff cannot now seek a 2008 loss related to Solar Drive because it would result in a double deduction and additional refund, and asks this Court to find the plaintiff is quasi-estopped from asserting a business-bad-debt-deduction for 2008.

Because the Court finds that the plaintiff's refund claims were untimely, it does not have any further jurisdiction over the case.  The Court declines to reach the parties' additional arguments because it cannot exercise jurisdiction over untimely claims or address points made in response to such claims.

### C.    Defendant's Counterclaims

The plaintiff claimed a business-bad-debt deduction in 2016, seeking to carry back a 2008 NOL to 2003, 2004, 2005, 2006, and 2007.  While the IRS denied his claim as to tax years 2003-2005 due to untimeliness, the IRS granted a standard two-year carryback that allowed Mr. Devine to seek a refund for 2006 and 2007.  The IRS issued the plaintiff refund checks for both years in February 2017.

The defendant has counterclaimed in this case, arguing that the refunds issued for tax years 2006 and 2007 were erroneously allowed because the plaintiff was not entitled to the business-bad-debt deduction in 2008.  It seeks to recover the amount allegedly erroneously refunded.  The defendant has requested a transfer of its counterclaims if the Court does not have jurisdiction over the plaintiff's claims.

To grant a motion to transfer claims under 28 U.S.C. § 1631, the Court must find that: (1) it lacks jurisdiction; (2) the proposed transferee court is one in which the case could have been brought at the time it was filed; and (3) the transfer is in the interest of justice.  *Paresky v. United States,* 139 Fed. Cl. 196, 203-04 (2018) (citing *Jan's Helicopter Serv., Inc. v. FAA,* 525 F.3d 1299, 1303 (Fed. Cir. 2008)).

First, the Court lost jurisdiction over the defendant's counterclaims when it became unable to exercise jurisdiction over the plaintiff's claims.  The Court originally had jurisdiction over the defendant's counterclaims.  *See* 28 U.S.C. § 1346(c) ("The jurisdiction conferred by this section includes jurisdiction of any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff commencing an action under this section.").  I.R.C. § 7405(a) provides that "[a]ny portion of a tax imposed by this title, refund of which is

erroneously made, within the meaning of section 6514, may be recovered by civil action brought in the name of the United States."

Because the plaintiff's claim was rejected for lack of jurisdiction, however, "the defendant's counterclaim must be dismissed along with plaintiff's complaint, without regard to the merits of the counterclaim." *Western Mgmt., Inc. v. United States*, 101 Fed. Cl. 105, 114 (2011), *aff'd and remanded in part*, 498 F. App'x 10 (Fed. Cir. 2012); *Bryne v. United States*, 127 Fed. Cl. 284, 299 (2016) (dismissing the government's counterclaim along with the plaintiff's complaint under RCFC 12(b)(1)).

Second, the transferee court must be one in which the case could have been brought. The defendant has argued that the transferee court—the United States District Court for the Central District of California—is one in which it could have brought its claims for recovery of erroneous refunds. The Central District of California, Western Division, is the proper venue because Mr. Devine is a resident of Los Angeles. *See* 28 U.S.C. § 84(c)(2). With respect to timing, the plaintiff's refunds for 2006 and 2007 were paid in February 2017. Because the defendant filed its counterclaims in September 2018, the government has satisfied the requirements of I.R.C. § 6532(b), which allows the government to bring a claim for an erroneous refund within two years of issuing it.

Finally, the Court finds that a transfer would best serve the interest of justice given how far this case has already progressed and the government's interest in its resolution on the merits.

Based on the factors set out in *Jan's Helicopter Service*, the Court finds that it has grounds to grant the defendant's motion for a transfer of its counterclaims and will order that the defendant's refund claims be transferred to the Central District of California.

## IV.   CONCLUSION

Because the plaintiff did not have a bona fide debt, he has not established entitlement to a business-bad-debt deduction under I.R.C. § 166. He therefore does not qualify for the extended statute of limitations under I.R.C. § 6511(d). As a result, only the time limit of I.R.C. § 6511(a) applies to his refund claims for tax years 2003, 2004, and 2005. Because these claims were filed outside the window allowed under I.R.C. § 6511(a), they are untimely. The Court therefore must dismiss his complaint for lack of jurisdiction pursuant to RCFC 12(b)(1). Lacking jurisdiction over the complaint, the Court also lacks jurisdiction over the defendant's counterclaim. The counterclaim will be transferred, in the interest of justice, to the Central District of California.

The Court will issue a separate order in accordance with this opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**