# In the United States Court of Federal Claims

No. 18-871
Filed: August 3, 2021
FOR PUBLICATION

TIMOTHY C. DEVINE,

              *Plaintiff*,

v.

UNITED STATES,

              *Defendant*.

*Michael James Maloney*, Felicello Law P.C., New York, NY, for the plaintiff.

*Miranda Bureau*, Tax Division, U.S. Department of Justice, Washington, D.C., with whom was *David Pincus*, Tax Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION AND ORDER

*HERTLING*, Judge

The plaintiff, Timothy C. Devine, filed suit in June 2018 seeking a refund of income taxes paid. He claimed entitlement to a refund based on a loss incurred through a business bad debt for advances he made to a partner in conjunction with a real estate investment project in Los Angeles. The defendant, the United States, acting through the Internal Revenue Service ("IRS"), opposed the plaintiff's claim and brought its own counterclaim to recover tax refunds it asserted were made in error. Following discovery, the defendant moved to dismiss or, in the alternative, for summary judgment, and sought to transfer its counterclaim to the United States District Court for the Central District of California in the event the court lacked jurisdiction over the case. The plaintiff opposed the motion to transfer.

The Court found that the advances made by the plaintiff to his partner were not debt and that, as a result, the plaintiff could not take advantage of an extended statute of limitations for filing refund claims reserved for business bad debts. The plaintiff's claim was therefore untimely. Accordingly, the Court dismissed the complaint for want of jurisdiction and granted the defendant's motion to transfer its counterclaim to the Central District of California. *Devine v. United States*, 152 Fed. Cl. 175 (2021).

Before the Court is the plaintiff's timely motion under Rule 59(a) and under Rule 60(b) of the Rules of the Court of Federal Claims ("RCFC") for reconsideration of the Court's judgment. (ECF 54.) The plaintiff argues that the Court misinterpreted relevant precedent and

state law, placed too great a weight on one factor in considering whether the plaintiff incurred a debt, and ignored evidence in the record.  The defendant opposes the motion.

The parties have fully briefed the motion (ECF 58, 59 & 62), and the Court heard argument on May 18, 2021.  At the Court's direction, the parties filed supplemental briefs (ECF 67 & 68) on June 11, 2021.  The Court denies the plaintiff's motion for reconsideration.

## I.      BACKGROUND

### A.      Factual Background

The facts are recited in detail in the Court's initial opinion on the merits of this case and will only be summarized here as relevant to the pending motion.  *See Devine*, 152 Fed. Cl. at 178-82.

In 2003, after a successful career as a music-industry executive, the plaintiff started to invest in real estate.  He planned to identify and acquire properties for rehabilitation, restore them, and offer them for rent or sale.

In March 2004, Mr. Devine met Ms. Shauna Giliberti, a licensed general contractor and the principal of a realty-development company.  Ms. Giliberti introduced Mr. Devine to a property located on Solar Drive in Los Angeles ("Solar Drive" property).  This 22-acre property included an 11,000-square-foot mansion that required extensive restoration.

Mr. Devine agreed to partner with Ms. Giliberti on the purchase and rehabilitation of the Solar Drive property.  On May 6, 2004, Mr. Devine and Ms. Giliberti closed on their purchase of Solar Drive.  The purchase price was $3.7 million.  Mr. Devine purchased his 50 percent share of the property as part of a like-kind exchange under I.R.C. § 1031.[1]  Mr. Devine advanced the funds necessary to purchase the property, a total of $4,050,464.30: $1,645,464.30 from his own funds and $2,405,000.00 from the proceeds of a loan he obtained in his own name.  Mr. Devine held the property through a corporate entity, Solar Drive, LLC, of which he was the sole owner.

On or around the purchase date of the Solar Drive property, Mr. Devine and Ms. Giliberti executed a Side Letter reciting that each held an undivided 50 percent co-ownership interest in Solar Drive as tenants in common.  It further provided that the parties would attempt to refinance the property as soon as possible after the closing, and that any proceeds from the refinancing would first be applied to reimburse the co-owners for monies advanced to improve and repair the property.

The Side Letter also specifically provided that:

> [i]n the event the Co-Owners execute promissory note(s) between
> the two of them and said promissory note(s) relate to the Property
> . . . . All Promissory Notes shall be paid in full upon the due date
> stated in the Promissory Note or the sale or refinance of the Property,

---

[1] References to Title 26 of the United States Code are cited as "I.R.C."

>whichever shall occur first. In the event of a sale or refinance of the
>Property, any unpaid Promissory Notes shall be paid directly from
>the escrow that receives the proceeds of the refinance or sale.

(ECF 39, Pl. Resp. Ex. C ¶ 6.)

Mr. Devine and Ms. Giliberti also prepared a Co-Tenancy Agreement that was incorporated into the Side Letter and provided that:

>[a]ll benefits and obligations of the Property, including without
>limitation, income, revenue, operating expenses, debt, proceeds
>from sale or refinance or condemnation awards shall be shared by
>the Co-Owners in proportion to their respective ownership interest
>. . . . No Co-Owner may advance funds to another Co-Owner to
>meet expenses associated with that Co-Owner's Ownership Interest,
>unless the advance is recourse to the Co-Owner and is for a period
>not to exceed 31 days. Such advances shall be evidenced by a
>Promissory Note containing a market rate of interest.

(*Id.*, Pl. Resp. Ex. B ¶ 5.)

Although the Co-Tenancy Agreement itself was never signed, the Side Letter, which was signed, expressly incorporated the Co-Tenancy Agreement and provided that "[t]his agreement and the Co-Tenancy Agreement between the parties dated May 6, 2004" are integrated agreements that set forth the entire agreement between the parties. (*Id.*, Pl. Resp. Ex. C ¶ 9.8.)

Mr. Devine agreed to pay Ms. Giliberti $1,600 per week for general contractor services for as long as Solar Drive needed improvements. These sums paid for renovations to the house. The plaintiff's apparent intent was for Ms. Giliberti to reimburse him for 50 percent of the sums he advanced for improvements to Solar Drive "[b]ecause it was all going to benefit each of our ownership stakes in the property." (*Id.*, Pl. Resp. Ex. A, A093.)

In 2005, Mr. Devine began demanding that Ms. Giliberti repay the money she owed him. By 2006, Ms. Giliberti had pledged her 50 percent tenant-in-common interest in the Solar Drive property to several different lenders. In April 2006, Ms. Giliberti filed for bankruptcy under Chapter 11; her bankruptcy was later converted to Chapter 7. In the bankruptcy proceeding, Solar Drive, LLC, filed a claim for the sums that Ms. Giliberti allegedly owed to Mr. Devine; the liquidated portion of these sums totaled $1,467,339.32.

In August 2006, Solar Drive, LLC, commenced an adversary proceeding against Ms. Giliberti in bankruptcy court seeking a determination that the amount she owed to Solar Drive, LLC, was non-dischargeable pursuant to 11 U.S.C. § 523. In 2007, Ms. Giliberti's 50 percent tenant-in-common interest in Solar Drive was foreclosed upon by the beneficiary of one or more deeds of trust she had granted.

In early 2008, Ms. Giliberti was contacted by another lender willing to finance a buy-out of Mr. Devine's 50 percent interest in Solar Drive and to pay off the sums she owed. Mr. Devine and Ms. Giliberti commenced negotiations regarding a purchase price and satisfaction of the

amounts she owed him.  While the co-tenants were negotiating the details of the sale, the global financial crisis hit.

In November 2008, Mr. Devine, Solar Drive, LLC, and Ms. Giliberti entered into a Purchase and Settlement Agreement ("2008 Agreement") concerning Solar Drive.  The 2008 Agreement provided that "Devine provided the initial down payment for the purchase of the [Solar Drive] Property, fifty percent (50%) of which was deemed to be a loan to Giliberti."  (*Id.*, Pl. Resp. Ex. O ¶ B.)  Mr. Devine expended "more than $900,000 for the cost of such improvements" to Solar Drive, 50 percent of which "were by agreement of the parties considered to be a loan to Giliberti," and "fifty percent of all moneys paid by Solar Drive to support the Property, including but not limited to mortgage payments, property taxes and insurance, were by agreement of the parties considered to be a loan to Giliberti."  (*Id.*)

The 2008 Agreement stipulated that Ms. Giliberti would pay $4,500,000 to Solar Drive, LLC: $2,000,000 for her purchase of the 50 percent interest in the property held by Solar Drive, LLC, and $2,500,000 in full settlement of the claims in the adversary proceeding in bankruptcy court.  Handwritten notations on the document reflect that the total payment amount was later changed to $4,400,000, reflecting a reduction of the amount to be paid in settlement of the adversary proceeding to $2,400,000.  Ultimately, however, due to the 2008 financial downturn, the financing Ms. Giliberti had secured in early 2008 was no longer viable, and, as a result, she failed to effectuate the purchase contemplated by the 2008 Agreement or to pay the sums she owed to Mr. Devine.  On May 20, 2009, the United States Bankruptcy Court for the Central District of California entered judgment in favor of Mr. Devine and Solar Drive, LLC, and against Ms. Giliberti in the amount of $2,500,000.

In 2014, Mr. Devine filed tax returns for tax years 2008 through 2013 for the first time.  On April 8, 2016, he filed an amended 2008 return on Form 1040X claiming a business-bad-debt deduction for tax year 2008.  He also filed amended returns on Form 1040X for tax years 2003, 2004, 2005, 2006, and 2007, and a Form 1045 Tentative Claim for Refund.  His 2008 Form 1045 sought to carry back a net-operating loss ("NOL") of $2,925,326.00 for the five preceding years.  He premised his claim on a provision of the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. 111-5, 123 Stat. 115, which provided a five-year carryback for a NOL incurred in 2008.

In May 2016, the IRS notified the plaintiff that his claim to elect the five-year carryback period under the relevant provision of ARRA was untimely because it "had to be filed on or before Oct. 15, 2009."  (*Id.*, Pl. Resp. Ex. E, A289.)  Ultimately, in January 2017, the IRS Appeals Office disallowed Mr. Devine's claim for a refund for tax years 2003, 2004, and 2005, but granted his appeal and allowed a refund with respect to tax years 2006 and 2007.  The IRS issued the plaintiff a check reflecting the refund, plus overpayment interest, for tax years 2006 and 2007.

## B.    Court's Decision and Judgment

The plaintiff's complaint sought a refund for tax years 2003, 2004, and 2005 based on a 2008 NOL, pursuant to the five-year carryback authorized by ARRA.

A claim for a refund of a tax payment must be filed "within the time limits imposed by [I.R.C.] § 6511(a)." *United States v. Dalm*, 494 U.S. 596, 602 (1990).  Section 6511 provides that a taxpayer must file a claim for refund with the IRS "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid." I.R.C. § 6511(a).

Mr. Devine did not file a refund claim within the time limit imposed by § 6511(a).  He filed his refund claim in April 2016, more than three years from filing his tax returns for tax year 2003 (filed in 2004), 2004 (filed in 2006), and 2005 (filed in 2007).  His refund claim was also filed more than two years from the time the tax was paid.  His claim was untimely under I.R.C. § 6511(a).

The plaintiff defended the timeliness of his refund claim by invoking I.R.C. § 6511(d), which sets forth an extended limitation period for filing a refund claim when a taxpayer seeks a refund related to a business-bad-debt deduction.  Section 6511(d)(1) provides that if the refund claim concerns "the deductibility by the taxpayer, under section 166 or section 832(c), of a debt as a debt which became worthless," then:

> in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 7 years from the date prescribed by law for filing the return for the year with respect to which the claim is made.  If the claim for credit or refund relates to an overpayment on account of the effect that the deductibility of such a debt or loss has on the application to the taxpayer of a carryback, the period shall be either 7 years from the date prescribed by law for filing the return for the year of the net operating loss which results in such carryback . . . .

I.R.C. § 6511(d)(1).

To take advantage of the extended seven-year statute of limitations of I.R.C. § 6511(d), the taxpayer's refund claim must be based on a business bad debt under I.R.C. § 166.  Section 166 permits an individual taxpayer to deduct in full, against ordinary income, a business bad debt that becomes worthless and to deduct that debt against ordinary income for other years as a NOL carryback or carryover.  *Estate of Mann v. United States*, 731 F.2d 267, 272 n.7 (5th Cir. 1984).  Non-business debt, in contrast, is treated as a short-term loss subject to limitations on deductibility.  *See* I.R.C. §§ 1211, 1212; *United States v. Generes*, 405 U.S. 93, 96 (1972).

Mr. Devine filed his tax return claiming a business-bad-debt deduction on April 11, 2016, which was within seven years of April 15, 2009, the deadline for filing a return for tax year 2008.  His refund claim would therefore be timely under I.R.C. § 6511(d).

In moving to dismiss, the defendant challenged the plaintiff's invocation of § 6511(d)'s extended statute of limitation.  The defendant argued that the loss Mr. Devine suffered was not due to bad business debts.  Because the loss for which the plaintiff sought a deduction was not the product of bad business debts, the defendant argued, the two-year limitations period of I.R.C.

§ 6511(a) applied.  Under this shorter window, the plaintiff's refund claims were untimely, and the Court lacked jurisdiction over the action.

After reviewing the relevant documentation, the Court determined that the funds advanced by Mr. Devine to the Solar Drive project did not constitute debt, but rather were capital investments in the project.  Without a bona fide debt, the plaintiff was unable to demonstrate that he had a business bad debt pursuant to I.R.C. § 166 and, as a result, could not show that he qualified for that deduction.  Without a business bad debt, the plaintiff was unable to rely upon I.R.C. § 6511(d)'s seven-year statute of limitations, which extends the time to file a refund claim only for valid business-bad-debt deductions under § 166.  Accordingly, the plaintiff's refund claim was held to be untimely, and the Court dismissed the plaintiff's claim under RCFC 12(b)(1) and 12(h)(3).  The Court granted the defendant's motion to transfer its counterclaim to the Central District of California.  Judgment was entered on January 14, 2021.

## II.    MOTION UNDER RCFC 59

### A.    Plaintiff's Motion

Following entry of judgment, the plaintiff filed a motion under RCFC 59(a), seeking reconsideration of the Court's determination.[2]  A motion under RCFC 59 allows a party to seek reconsideration in a broad range of circumstances.  Under RCFC 59(b), a motion for reconsideration must be filed within 28 days of the entry of the judgment.  The plaintiff's motion, filed on February 3, 2021, is timely under RCFC 59.  The plaintiff argues that the Court's "opinion presents a clear error of law and manifest injustice."[3]  (ECF 54-1 at 1.)

---

[2] The plaintiff also purports to file his motion under RCFC 60(b).  (ECF 54-1 at 1.)  The plaintiff does not identify which paragraph of RCFC 60(b) applies to his motion.  RCFC 59 and RCFC 60 are similar in purpose, allowing a party to seek reconsideration of a court's decision.  Under RCFC 59, a motion for reconsideration must be brought within 28 days of the decision for which reconsideration is sought.  RCFC 59(b).  Under RCFC 60(b), the window for seeking reconsideration is longer.

The standards under which a court evaluates a motion under RCFC 59 and RCFC 60 are similar, and courts in some instances consider both rules in analyzing a litigant's claim.  *See, e.g.*, *Cyios Corp. v. United States*, 124 Fed. Cl. 107, 114 (2015) (considering a motion brought pursuant to both RCFC 59 and 60 under both rules); *Webster v. United States*, 93 Fed. Cl, 676, 680 (2010) (same).  While the shorter deadline of RCFC 59 at times constrains a court to consider a motion only under RCFC 60, the filing in this case of a timely motion under RCFC 59 presents no such limitation.  *See Bowling v. United States*, 93 Fed. Cl. 551, 561 n.1 (2010) (noting that because the plaintiff's motion was "timely filed under RCFC 59" the court would address the motion under RCFC 59 rather than RCFC 60).  Accordingly, the Court will treat the motion as one under RCFC 59 and merge the motion under RCFC 60(b) into the motion under RCFC 59.

[3] The plaintiff's argument is erroneously premised on the Court having granted summary judgment.  (ECF 54-1 at 1.)  The Court did not grant summary judgment but instead dismissed

B.      **Standard for Decision**

The standard for a motion for reconsideration is laid out in RCFC 59(a)(1), which provides:

> The Court may, on motion, grant a new trial or a motion for reconsideration on all or some of the issues—and to any party—as follows:
>
> (A) for any reason for which a new trial has heretofore been granted in an action at law in federal court;
>
> (B) for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court; or
>
> (C) upon the showing of satisfactory evidence, cumulative or otherwise, that any fraud, wrong, or injustice has been done to the United States.

RCFC 59(a)(1).

"Under [RCFC] 59(a)(1), a court, in its discretion, may grant a motion for reconsideration when there has been an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice." *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016) (internal quotation and citation omitted).

"Reconsideration of a judgment is not intended to permit a party to [reargue] its case when it previously was afforded a full and fair opportunity to do so." *Peretz v. United States*, 151 Fed. Cl. 465, 468 (2020), *appeal pending*, No. 21-1831 (Fed. Cir.).  Rule 59 does not provide an opportunity to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (internal quotation and citation omitted); *see also Peretz*, 151 Fed. Cl. at 468; *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002); *Principal Mut. Life Ins. Co. v. United States*, 29 Fed. Cl. 157, 164 (1993).

Given its limited purpose, a "[m]otion[ ] for reconsideration must be supported by a showing of extraordinary circumstances which justify relief." *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (internal quotation and citation omitted).  In the case of a party seeking reconsideration on the ground of manifest injustice, that party must demonstrate that such injustice is "apparent to the point of being almost indisputable." *Pac. Gas & Elec. Co. v. United States*, 74 Fed. Cl. 779, 785 (2006), *aff'd in part and rev'd on other grounds,* 536 F.3d 1282 (Fed. Cir. 2008).

---

the case for want of jurisdiction.  The plaintiff's error makes little difference for the substance of his motion or its resolution.

### III.   PLAINTIFF'S ARGUMENTS

The plaintiff argues that the Court erred in finding the absence of a bona fide debt under the Internal Revenue Code and Treas. Reg. § 1.166-1(c).  (ECF 54-1 at 4.)  He presents four arguments in support of his motion.  The plaintiff's first three arguments are presented in his opening brief in support of his motion.  (*Id.* at 3-8.)  The fourth is raised only in his reply brief. (ECF 59.)

First, the plaintiff relies on language in a decision by the Court of Claims recognizing that "[t]he relationship of debtor and creditor arises when one person, by contract or law, is liable or bound to pay another an amount of money, certain or uncertain . . . ."  *Iowa S. Util. Co. v. United States*, 172 Ct. Cl. 21, 27 (1965) (quoting *Birdsboro Steel Foundry & Mach. Co. v. United States*, 78 Ct. Cl. 100, 108 (1933)).  The plaintiff relies further on the discussion in *Birdsboro* that "it is not necessary that the debt shall be due in the sense that it is then collectible; it must be an outstanding obligation, which, if not due at the time, will certainly become due at some future date."  *Birdsboro*, 78 Ct. Cl. at 108. The plaintiff applies this description of a debtor–creditor relationship to the Court's finding that "Ms. Giliberti had an obligation to repay the [plaintiff's] advances."  *Devine*, 152 Fed. Cl. at 186.  Because that obligation arose by operation of either contract or law, the plaintiff argues, the holding of the Court of Claims in *Iowa Southern Utilities* compels a conclusion contrary to the one reached by the Court.[4]

Second, the plaintiff argues that that Court misunderstood and misapplied California law regarding the obligations of tenants in common.  *See Devine*, 152 Fed. Cl. at 188, 190. Specifically, the plaintiff argues that the Court's conclusion that "there would be a need for a promissory note and recourse debt 'only if one co-owner loaned funds to the other for the purpose of meeting expenses associated with that Co-Owner's Ownership Interest . . . .'" was wrong under applicable California law and premised on an erroneous factual presumption.  (ECF 54-1 at 5 (quoting *Devine*, 152 Fed. Cl. at 188 (internal citation omitted)).)  The plaintiff argues that, in applying California law, the Court mistakenly "speculate[d]" that the absence of a promissory note between Ms. Giliberti and the plaintiff was dispositive in proving that the plaintiff's advances were investments in the project rather than debt.  (*Id.*)

The plaintiff argues that the uncontroverted evidence before the Court reflects that the plaintiff and Ms. Giliberti each owned 50 percent of the project as tenants in common, and that the plaintiff advanced payments for the project "'in excess of his proportion' of ownership."  (*Id.* at 5-6 (quoting *Willmon v. Koyer*, 168 Cal. 369, 372-73 (1919).)  The plaintiff argues that the Court correctly explained the holding of *Willmon* that the co-tenant who makes disproportionate contributions may recoup those contributions from the other co-tenant(s).  Rather than supporting the Court's conclusion that no bona fide debt existed, the plaintiff argues that *Willmon* compels the opposite conclusion when read in conjunction with *Iowa Southern Utilities*. Thus, by operation of California law, Ms. Giliberti owed the plaintiff the amounts that exceeded

---

[4] Decisions of the former Court of Claims, a predecessor to the Federal Circuit, remain binding on this Court unless overturned by a higher court or by statute.  *S. Corp. v. United States*, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982).

his half-share in their project, and under *Iowa Southern Utilities*, a bona fide debt was owed by Ms. Giliberti to Mr. Devine.  (*Id.* at 5-7.)

Third, the plaintiff argues that the Court overlooked relevant facts in the record that undercut the Court's conclusion that no bona fide debt existed between the plaintiff and Ms. Giliberti.  The plaintiff argues that the Court erred in placing too much emphasis on the absence of signed promissory notes between Ms. Giliberti and the plaintiff.  He argues that the record contains facts that do not foreclose conclusively at this stage of the case that the plaintiff did not contemplate obtaining and did not try to obtain promissory notes from Ms. Giliberti under the agreement between the two partners.  As a result, the Court was wrong to have found the absence of promissory notes a factor on which to base its conclusion that no bona fide debt existed.[5]  (*Id.* at 7-8.)  The plaintiff also cites in support of his argument the decision in *Taiyo Hawaii Company, Ltd. v. Comm'r*, 108 T.C. 590, 612 (1997), in which the Tax Court held that advances by one partner to another were debt in the absence of promissory notes.

Finally, in his reply brief, the plaintiff, building on his reliance in his opening brief on *Iowa Southern Utilities* and *Birdsboro*, adds as additional authority the IRS's own policy reflected in Revenue Procedure 2002-22.  (ECF 59 at 1 (citing Rev. Proc. 2002-22, 2002-1 C.B. 733.))  The plaintiff argues that under Rev. Proc. 2002-22, the IRS itself deems the plaintiff's advances to "constitute a bona fide debt, not equity."[6]  (*Id.* at 3.)  The plaintiff notes (*id*. at 2) that Rev. Proc. 2002-22 itself specifies that in a tenancy in common "[n]either the other co-

---

[5] The plaintiff argues in his opening brief that material facts, specifically surrounding the absence of promissory notes, are in dispute and, as a result, summary judgment is not proper.  He also argues that the facts regarding his intent to create debt and not advance equity are unrebutted.  To support his factual assertions, the plaintiff provides an additional declaration and other exhibits to demonstrate that material facts are in dispute.  (*See* ECF 54-2, 54-3 & 54-4.)

This argument is misplaced.  The Court did not grant summary judgment.  Rather, as noted in footnote 3, above, the Court dismissed the plaintiff's claim because it was untimely and, as a result, the Court lacked jurisdiction over it.  *Devine*, 152 Fed. Cl. at 193.  The Court is permitted to make factual determinations in resolving a dispute over its jurisdiction.  *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999).  The Court determined that it was able to reach a conclusion regarding the untimeliness of the complaint based on unambiguous, contemporaneous documentation in the record, and therefore did not find it necessary to resolve any disputed facts, despite its ability to do so.  The facts offered by the plaintiff to show that material facts are disputed are inadequate to overcome the contemporaneous documentation on which the Court relied in dismissing the case for lack of jurisdiction.  The plaintiff also fails to demonstrate that promissory notes were executed or that there is a dispute over whether promissory notes were executed between the plaintiff and Ms. Giliberti.  If the plaintiff is to prevail, he must do so as a matter of law.  Accordingly, the Court rejects the plaintiff's argument that "summary judgment" was improper.

[6] Because the plaintiff did not raise Rev. Proc. 2002-22 until his reply brief in support of his motion under RCFC 59, the Court allowed the defendant to file a sur-reply (ECF 62) to address Rev. Proc. 2002-22.

owners, nor the sponsor, nor the manager may advance funds to a co-owner to meet expenses associated with the co-ownership interest, unless the advance is recourse to the co-owner (and, where the co-owner is a disregarded entity, the owner of the co-owner) and is not for a period exceeding 31 days." Rev. Proc. 2002-22 ¶ 6.08.

## IV.    ANALYSIS

The Internal Revenue Code and the regulations comprising our tax system are not always clear. Courts nevertheless cannot "avoid determination of [the tax issues before them] merely because the task is difficult." *Reisner v. Comm'r*, 34 T.C. 1122, 1129 (1960). Indeed, in such an instance, a court endeavors even more stringently to arrive at the correct outcome. Rather than dismiss the plaintiff's claims as repetitions of his earlier arguments, the Court considers anew the substance of the plaintiff's arguments to determine whether the initial decision was correct and to avoid any risk of injustice.

Accordingly, the Court addresses each of the plaintiff's arguments in turn. The Court begins by evaluating the applicability and effect of *Iowa Southern Utilities* before turning to the plaintiff's challenge to the Court's interpretation of California law, the Opinion's findings regarding the existence of a bona fide debt, and the plaintiff's argument pertaining to Revenue Procedure 2002-22.

### A.    Precedent

The parties dispute the proper interpretation and significance of *Iowa Southern Utilities*. The plaintiff in that action was an Iowa-based public utility. *Iowa Southern Utilities*, 172 Ct. Cl. at 493. In 1952, stockholders alleged that certain principal officers had fraudulently and in breach of their fiduciary duty as officers and directors sold property to the company at an inflated price. The stockholders brought a derivative action on behalf of the company. *Id.* at 494. The Iowa Supreme Court ruled in favor of the stockholders, entering judgment against the officers for more than $2 million. *Id.*

The company subsequently sought a bad-debt deduction for the 1953 tax year for the uncollected balance of the Iowa judgment. The company claimed that the deduction would result in a NOL, entitling it to a refund for overpayment of 1953 taxes. The government argued that while the uncollected balance of the judgment was a "loss," it was not a deductible "debt" under the Internal Revenue Code. *Id.* The court was therefore tasked with determining "whether or not the uncollected balance of the Iowa Court's judgment is a deductible 'debt' under the Code . . . ." *Id.* at 494-95.

The Court of Claims began by quoting the text of 26 C.F.R. 1.166-1(c). "'A bona fide debt is a debt which arises from a debtor creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.'" *Id.* at 495 (quoting 26 C.F.R. 1.166-1(c)). The regulation thus creates three requirements: (1) a debtor–creditor relationship, (2) a valid and enforceable obligation to pay, and (3) a fixed or determinable sum of money. The court noted that this language "is nothing more than a restatement of the basic essentials of a 'debt' as defined by the courts generally." *Id.*

Having set forth this standard, the court explained that the judgment against the officers was not necessarily a debt for purposes of the Internal Revenue Code:

> The Iowa Court's judgment against the [directors] determined a "valid and enforceable obligation" of defendants therein "to pay a fixed or determinable sum of money" to plaintiff within the meaning of Treasury Regulations 1.166-1(c), supra.  However, the judgment per se does not determine whether there is a "debt" within the meaning of the Internal Revenue laws and regulations.  As the Court of Appeals for the Fifth Circuit said, . . . "[t]he nature of the transaction underlying the judgment, not the judgment itself, controls the tax effects."

*Id.* (quoting *Cotnam v. Comm'r*, 263 F.2d 119, 122, 70 (5th Cir. 1959) (citing *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88 (1936))).  The "valid and enforceable obligation" to pay a "fixed or determinable sum of money" in that instance was found not to be sufficient to determine whether a "debt" existed for tax purposes.  *Id.*

In rebutting the government's assertion that the officers had no intent to repay the money, meaning that there could be no debt to the company, the Court of Claims noted that "a voluntary debt arising out of the intent of the parties is not the only kind of debt recognizable for tax deduction purposes.  A debt can arise by operation of law without proof of specific intent to create a debtor-creditor relationship."  *Id.* at 495-96.  The court quoted *Birdsboro Steel Foundry & Machine Co. v. United States*, 78 Ct. Cl. 100 (1933), which explained: "'The relationship of debtor and creditor arises where one person, by contract or law, is liable or bound to pay another an amount of money, certain or uncertain.'"  *Id.* (quoting *Birdsboro*, 78 Ct. Cl. at 108).

The court emphasized in *Iowa Southern Utilities* that the payment obligation at issue arose by law and derived from the special fiduciary relationship between the corporation and the directors: "when plaintiff's officers and directors breached their fiduciary duty by their fraudulent sale of the ten utilities to the corporation, the law imposed upon them a clear and unqualified obligation to repay their fraudulent profits and at the same time plaintiff derived a clear and unqualified right to recover such profits."  *Id.* at 497.  The Court of Claims ultimately held that the uncollectible balance of the 1952 judgment against the directors was a "bad debt" under § 166.  *Id.* at 498.

The plaintiff argues that due to the relationship between Mr. Devine and Ms. Giliberti as co-tenants, the rationale of *Iowa Southern Utilities* applies to their relationship and demands that the funds advanced to the Solar Drive project by Mr. Devine be treated as debt.

The Court finds that the principles explained by the Court of Claims in *Iowa Southern Utilities* do not control the outcome of the plaintiff's claim.  The court in *Iowa Southern Utilities* established that "[a] debt *can* arise by operation of law without proof of specific intent to create a debtor-creditor relationship."  *Id.* at 495-96 (emphasis added).  The decision does not establish that a debt *always* arises in such an instance.  The court in *Iowa Southern Utilities* premised its finding that a bona fide debt existed on the special fiduciary relationship between the officers and the company.

11

This case is not analogous.  While the co-tenant relationship between Mr. Devine and Ms. Giliberti may have established a fiduciary duty between them and, created a right under California law to repayment of funds advanced in support of the jointly owned property, this case does not lack the "proof of specific intent to create a debtor-creditor relationship" that existed in *Iowa Southern Utilities*.  *Id.*  In fact, the opposite is true.  The record reflects that the co-tenants in this case *did* intend to create a debtor–creditor relationship under the specific circumstances set forth in the Co-Tenancy Agreement.  (*See* ECF 39, Pl. Resp. Ex. B ¶ 5.)  The co-tenants failed to follow the steps to which they agreed to create such a relationship.  The record reflects that the co-tenants contemplated the formation of a debtor–creditor relationship between themselves but Mr. Devine chose not to follow the terms of his unambiguous agreement with Ms. Giliberti.  Moreover, the agreement between the co-tenants specifically provided that one co-tenant could *not* in fact advance funds to the other co-tenant unless that advance met specific terms.  (*Id.*)  The co-tenants had agreed as well that the side letter and the co-tenancy agreement it incorporated set forth the entire agreement between the co-tenants.  (*Id.*, Pl. Resp. Ex. C. ¶ 9.8.)

The holding of the Court of Claims in *Iowa Southern Utilities* pertained to instances in which there was no evidence of specific intent.  In a case such as that one, involving multiple shareholders and executives of a publicly held corporation, the court held that the law supplied the appropriate governing rule.  In a case involving only two co-tenants whose intent was made clear in the documentation of their agreement with each other, the holding of *Iowa Southern Utilities* does not apply and provides no help to the plaintiff.

A second problem with the plaintiff's reliance on *Iowa Southern Utilities* is that the requirement for the existence of a bona fide debt under Treas. Reg. § 1.166-1(c) involves three elements: (1) a debtor–creditor relationship, (2) a valid and enforceable obligation to pay, and (3) a fixed or determinable sum of money.  Treas. Reg. § 1.166-1(c).  As the defendant argues, "although *Iowa Southern* referred to operation of law in finding that a debtor-creditor relationship existed under the facts of that case, the Court of Claims did not hold that state law determines whether all elements of a bona fide debt have been met for federal tax purposes." (ECF 58 at 3.)  The defendant argues that the plaintiff "has not shown a valid and enforceable obligation or that the amount of any purported debt was a fixed or determinable sum of money, such that a bona fide debt existed."  (*Id.*)

Even if the Court were to find a debtor–creditor relationship through operation of law, the plaintiff's "valid and enforceable obligation" must be one recognized by the federal tax system.  As discussed below, the plaintiff's reliance on remedies available under California state law do not satisfy the test for "debt" for federal tax purposes.  In *Iowa Southern Utilities*, the Iowa court's judgment against the officers satisfied the factors of a "valid and enforceable obligation" to "pay a fixed or determinable sum of money"; the Court of Claims nevertheless found that the state court "judgment per se does not determine whether there is a 'debt' within the meaning of the Internal Revenue laws and regulations." *Id.* at 495.  The court instead considered the underlying nature of the entire transaction.  *Id.*  This Court considered the nature of Mr. Devine's transaction with Ms. Giliberti in its entirety on the merits and does so again below.

The plaintiff's reliance on *Iowa Southern Utilities* does not control the outcome in this case.  The Court therefore rejects his arguments premised upon that Court of Claims precedent.

### B. California Law

Flowing from the plaintiff's argument under *Iowa Southern Utilities* that "[a] debt can arise by operation of law without proof of specific intent to create a debtor-creditor relationship," the plaintiff challenges the Court's analysis of California law. *Iowa Southern Utilities*, 172 Cl. Ct. at 495-96. The plaintiff argues that because California law permits co-tenants who have paid in excess of their proportion of ownership to recover payment from other co-tenants, there exists a "right of recovery that arises *by operation of California law*, regardless of the text of the Co-Tenancy Agreement." (ECF 54-1 at 5-6 (emphasis in original) (citing *Willmon v. Koyer*, 168 Cal. 369, 372-73 (1914)).) Even if the Co-Tenancy Agreement required promissory notes for any advances, the plaintiff argues, a payment obligation still arose by operation of law.

Not every obligation under state law to repay funds advanced creates a bona fide debt for federal tax purposes. The Internal Revenue Code determines the nature of an obligation for purposes of federal law; a state court's dictates do not control the application of federal tax laws to specific transactions. *Kirkpatrick v. Comm'r.*, T.C. Memo 2018-20, 2018 WL 1040955 (2018) (collecting cases). Instead, "[s]tate law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Burnet v. Harmel*, 287 U.S. 103, 110 (1932).

The Supreme Court has emphasized that the overarching goal of uniformity across the federal tax system takes precedence over adherence to local law. In *United States v. Gilbert Assocs., Inc.*, 345 U.S. 361, 364-66 (1953), for example, the Court held that a town that was a judgment creditor for purposes of state law "was not a judgment creditor" within the meaning of the tax code. *Id.* at 365. The Court noted that "[a] cardinal principle of Congress in its tax scheme is uniformity" and that the term "'judgment creditor' should have the same application in all the states" under federal law. *Id.* at 364.

As applied to this case, the definition of a bona fide debt for federal tax purposes does not turn on each state's law concerning the reimbursement of co-tenants. *See Robertson v. Comm'r*, T.C. Memo. 1997–526, 74 T.C.M. (CCH) 1257, 1261 (1997) ("A State's public policy to the contrary cannot control the operation of Federal tax laws unless otherwise expressly provided for by Congress." (citing *Burnet*, 287 U.S. at 110)).

Conflicts between state property law and federal tax law often arise in the context of wills and estates. In such instances, courts have routinely held that "[i]n determining the extent of decedent's interest in the property the court must look to state law, but once the nature and extent of that interest is determined, federal law governs its taxability." *See, e.g.*, *Ernest and Mary Hayward Weir Found. v. United States*, 362 F. Supp. 928, 934 (S.D.N.Y. 1973).

Here, California state law may vest Mr. Devine with a right of recovery from Ms. Giliberti for the advances of funds he provided to their project. A co-tenant may seek reimbursement from other co-tenants for their proportionate share of the expenses paid for the benefit of the common property. *See Willmon v. Koyer*, 168 Cal. at 372. One co-tenant is entitled to credit from other co-tenants for expenditures necessarily made for the protection of the common property. *Shenson v. Shenson*, 124 Cal. App. 2d 747 (1954) (holding that tax and mortgage payments were covered by this rule).

13

This right Mr. Devine enjoyed under California property law to reimbursement from Ms. Giliberti does not automatically create a debt for purposes of federal tax law. The plaintiff recognizes that not "*all* state law obligations give rise to a bona fide debt for purposes of Treas. Reg. § 1.166-1(c)." (ECF 59 at 3 (emphasis in original).) The plaintiff has pointed to no case in his motion for reconsideration demonstrating that a co-tenant's right to recovery creates a debt as defined by the Internal Revenue Code.[7] The Court's Opinion considered the definition of "debt" as set forth in the Code and in federal case law and weighed that definition against the objective elements of the agreement between Mr. Devine and Ms. Giliberti. As discussed below, the Court's comprehensive review of the factors that define "bona fide debt" led to the conclusion that no bona fide debt exists in this case in the federal tax context.

### C.      Bona Fide Debt

The Court next considers whether it overlooked facts that demonstrate the existence of a bona fide debt or whether some portion of the advances made by Mr. Devine may be considered debt.

### 1.      Existence of a Debt

A review of the plaintiff's arguments on reconsideration leads the Court to conclude it did not err in finding no bona fide debt existed between Mr. Devine and Ms. Giliberti. Mr. Devine did not meet the burden of proof to establish jurisdiction by showing that his "purported debt is in substance and fact a debt for tax purposes." *VHC, Inc. v. Comm'r*, T.C. Memo 2017-220, 2017 WL 5157771, at *17.

The plaintiff argues that the Court placed too great an emphasis on the fact that no promissory note was signed before Mr. Devine made advances in support of Solar Drive. The plaintiff cites in support of his argument *Taiyo Hawaii Company*, in which the Tax Court found that the taxpayer had advanced funds as debt rather than equity even though "the parties to the transactions did not follow all of the formalities that might be considered probative that the advances were debt rather than equity," including no evidence of promissory notes. 108 T.C. at 602-03.

Promissory notes are not dispositive, and the Court did not hold that they were. The absence of a promissory note was but one of several factors considered in determining whether a debt exists. *See Hardman v. United States*, 827 F.2d 1409, 1411 (9th Cir. 1987) (setting forth 11 factors for consideration). "Classification of an interest as debt or equity, for purposes of federal income tax, 'must be considered in the context of the overall transaction.'" *Hewlett-Packard Co.*

---

[7] The plaintiff argues that several cases cited by the Court are "inapplicable" because there was no "co-tenancy relationship at issue" in those cases. (ECF 54-1 at 7.) The plaintiff, however, cites no cases in which there was in fact a co-tenancy relationship that a court considered in determining whether a bona fide debt existed. Indeed, such a precedent would have proved useful in analyzing the plaintiff's claims, but the plaintiff has not cited any case the Court failed to consider.

*v. Comm'r*, T.C. Memo 2012-135, 2012 WL 1673643 (2012) (quoting *Hardman*, 827 F.2d at 1411).

The Court thoroughly reviewed the circumstances surrounding Mr. Devine's advances and did not rely solely on the lack of promissory notes in making its determination.  The Court considered the objective evidence of the parties' intent.  Here, the Co-Tenancy Agreement expressed the intent to use promissory notes.  (ECF 39, Pl. Resp. Ex. B ¶ 5.).  The lack of payment of interest also carried significant weight; while the use of promissory notes would have involved market-rate interest under the co-tenants' agreement (*id.*), the advances Mr. Devine did make were not explicitly subject to the payment of interest.  *Devine*, 152 Fed. Cl. at 188.  The Court considered the lack of a fixed maturity date for the alleged loans and the lack of ability to enforce his right to repayment outside the context of California co-tenancy law.  *Id.* at 189-90.  Also relevant to the Court's conclusion was the express subordination of any payment obligation to Mr. Devine to other lenders.  (ECF 39, Pl. Ex. C. ¶¶ 4, 6.)  The Court thus considered the entire context and weighed all relevant factors to determine whether the funds advanced were loans or equity.  Mr. Devine's motion for reconsideration ignores the Court's exhaustive analysis in favor of highlighting one factor the Court considered but did not find dispositive.

The plaintiff asserts that the Court should consider and place significant weight on the evidence in the record that Mr. Devine made great efforts to induce Ms. Giliberti to sign a promissory note.  (ECF 54-1 at 8.)  This evidence, however, while in part supporting the plaintiff's claim, primarily cuts against it; Ms. Giliberti's unwillingness to sign documents regarding the Solar Drive project increased the risk to Mr. Devine that he would not be able to recoup the funds he advanced and should have put him on notice not to advance further funds.

The taxpayer bears the burden of proof to establish that "a purported debt is in substance and fact a debt for tax purposes." *VHC, Inc.*, 2017 WL 5157771, at *17.  Mr. Devine did not do so in his case on the merits, nor does he do so here.

### 2.    Separate Transactions

Although the Court has determined that it does not have jurisdiction over the plaintiff's claim as presented because it did not meet the definition of a bona fide debt, the Court also considers whether it has jurisdiction over a refund claim for some portion of the funds—rather than the sum total—advanced by Mr. Devine to Ms. Giliberti.  The Court does so because the funds the plaintiff continued to advance to cover property taxes and insurance and possibly funds advanced to cover mortgage-interest payments on the Solar Drive property bear some of the hallmarks of debt.  These advances did not increase Mr. Devine's share of ownership in the property and may have constituted a debt owed to the plaintiff by Ms. Giliberti.  Had Mr. Devine separated the elements of his claim into separate transactions at the time they occurred and then before the IRS, portions of that claim may have supported the application of the extended statute of limitations of which the plaintiff sought to take advantage.

The Internal Revenue Code requires a taxpayer first to file a refund claim with the IRS before suing for a refund.  I.R.C. § 7422(a).  The filing of a timely refund claim is a jurisdictional prerequisite to a refund suit.  *Comm'r v. Lundy*, 516 U.S. 235, 240 (1996).  Under the substantial variance doctrine, a taxpayer cannot maintain a refund suit based on factual or legal grounds not

raised in the claim for a refund.  *Computervision Corp. v. United States*, 445 F.3d 1355, 1364 n.8 (Fed. Cir. 2006).  The doctrine benefits the IRS by limiting "any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to defend."  *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000).

Additionally, "an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer."  *Casner v. Comm'r*, 450 F.2d 379 (5th Cir. 1971).  When a case involves "a series of transactions designed and executed as parts of a unitary plan to achieve an intended result," then "such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation.  The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated."  *Id.* (quoting *Kanawha Gas & Utilities Co. v. Comm'r*, 214 F.2d 685, 691 (5th Cir. 1954)).

Mr. Devine was required to submit to the IRS a refund claim that provided notice of the nature and extent of his claim.  He submitted a refund claim for the full amount of all the funds he claims to have advanced to Ms. Giliberti.  He did not break out the various elements of those advances, and the IRS did not have the opportunity to review the discrete and separate elements that comprise the entire refund claim being pursued by the plaintiff.  Because of the manner the plaintiff chose to pursue his refund claim, he is unable to assert entitlement to funds in a manner that exceeds the scope of his claim before the IRS.  Accordingly, the Court may not separate some elements of his claim that might have allowed the plaintiff to take advantage of the extended statute of limitations.  The Court must take the plaintiff's claim as a whole.  The plaintiff seems to acknowledge that his claim must be evaluated as a unitary one, but argues in his supplemental brief that "if the Court is inclined to consider each category of funds separately" then the burden of proof rests with the defendant to dispute the plaintiff's credible evidence pursuant to I.R.C. § 7491(a)(1).  (ECF 68 at 4-5.)  That approach is foreclosed by the law, as explained above, and even if it were not, would be the tail wagging the dog.  When the plaintiff's single claim is evaluated under all the relevant facts and circumstances, the plaintiff is unable to maintain a claim that his refund claim reflects a business bad debt.

Taken together, the substantial variance doctrine and the inability of a taxpayer to separate into components one of a series of interrelated transactions limits this Court's ability to ascertain whether some portion or type of funds advanced by Mr. Devine merit special tax treatment.  Mr. Devine presented a claim for a single sum to the IRS without categorizing the payments he made.  The Court is thus unable to differentiate among the types of advances Mr. Devine contributed to the project and offer relief for some limited set of advances.

## D.   Revenue Procedure 2002-22

The plaintiff cites Revenue Procedure 2002-22 in his reply brief to argue that the IRS deems advances between co-owners to be recourse and that the Co-Tenancy Agreement between him and Ms. Giliberti was written with Revenue Procedure 2002-22 in mind.  The plaintiff's reliance on the revenue procedure is misplaced.

Revenue Procedure 2002-22, titled "Undivided Fractional Interests in Real Estate," identified its purpose: "This revenue procedure specifies the conditions under which the Internal

Revenue Service will consider a request for a ruling that an undivided fractional interest in rental real property (other than a mineral property as defined in section 614) is not an interest in a business entity . . . ."  Rev. Proc. 2002-22.

The plaintiff argues that the revenue procedure demonstrates "IRS federal policy concerning the treatment of advances made between co-tenants" and that, outside the context of a partnership relationship, advances from one co-tenant to another would be recourse debt, not equity.  (ECF 59 at 1-2.)  The revenue procedure, however, contains no such explicit statement. Moreover, the subject matter of the revenue procedure does not extend to the determination of whether advances are debt or equity under I.R.C. § 166, the provision at the core of this case.  It specifically defined its scope as providing "guidelines for requesting advance rulings" and it was "not intended to be substantive rules."  *Id.*  Even to the extent that the parties crafted their agreement against the backdrop of the revenue procedure, as the plaintiff argues, they did not follow the terms of the agreement they drafted with Revenue Procedure 2002-22 in mind, given that the advances lacked promissory notes and other indicia the parties themselves identified regarding how to categorize advances made between them.

Because Revenue Procedure 2002-22 was limited in scope, did not define debt for the purposes of I.R.C. § 166, and was not followed by the co-tenants, it does not support the plaintiff's argument that Mr. Devine's advances to Ms. Giliberti created a debt.

## V.     CONCLUSION

The plaintiff has not presented any persuasive explanation that the Court erred as a matter of law in deciding his case.  The plaintiff raises arguments the Court considered regarding applicable case law, the interpretation of California state law, and the relevance of promissory notes in evaluating whether a bona fide debt exists.  The plaintiff also raises a new argument in his reply brief regarding an inapplicable revenue procedure.

After careful consideration of the plaintiff's arguments, the Court finds that this case presents no "intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice."  *Biery*, 818 F.3d at 711 (internal quotation omitted).  The plaintiff has not established an entitlement to have the Court overturn its original decision.

The plaintiff's motion for reconsideration is **DENIED**.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**